[Cite as *Gallagher v. Firelands Regional Med. Ctr.*, 2017-Ohio-483.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

| | |
|---|---|
| James P. Gallagher, et al. | Court of Appeals No. E-15-055 |
| Appellees | Trial Court No. 2013 CV 0390 |
| v. | |
| Firelands Regional Medical Center | **DECISION AND JUDGMENT** |
| Appellant | Decided: February 8, 2017 |

* * * * *

Charles M. Murray and Margaret M. Murray, for appellees.

Martin T. Galvin, Brian D. Sullivan and Michael P. Murphy, for appellant.

* * * * *

**YARBROUGH, J.**

{¶ 1} This is an appeal from the judgment of the Erie County Court of Common Pleas, which granted appellees', James P. Gallagher, Executor of the Estates of Mary Gallagher and Thomas C. Gallagher, motion for a new trial following a seven-day jury trial on their medical negligence claim. For the reasons that follow, we reverse.

## I. Facts and Procedural Background

{¶ 2} The genesis of this matter began on May 30, 2012, when Mary Gallagher underwent a procedure at appellant, Firelands Regional Medical Center, to clear blockage from her left carotid artery. Going into the procedure, Mary, who was 84 years old at the time, had a baseline blood pressure of 140/58. The procedure was completed without complication, and Mary entered the Post-Anesthesia Care Unit ("PACU") at 2:50 p.m. At that time, her blood pressure was 86/54. Notably, it was expected that her blood pressure would be low for up to four to five hours following the carotid procedure, and she was receiving fluids as treatment for the low blood pressure. During the approximately one hour and fifteen minutes that Mary was in the PACU, her blood pressure readings were: 96/66, 87/52, 83/51, 83/51, 98/53, 88/51, and 96/49. It is undisputed that Mary did not see a doctor while she was in the PACU.

{¶ 3} At 4:05 p.m., Mary was discharged to the floor, and her blood pressure at 4:25 p.m. was 85/46. Mary continued to have systolic blood pressure readings in the 80s and 90s throughout the rest of the day. However, the nurses testified that Mary was otherwise asymptomatic, noting that she was alert, was able to get up and move around, and use the restroom. At 11:30 p.m., a nurse woke up Mary to assess her, at which time Mary was confused about her surroundings, but the nurse testified that she was easily reoriented. No doctor was alerted to Mary's low blood pressure throughout the day.

{¶ 4} At 1:35 a.m. on May 31, 2012, it was discovered that the left side of Mary's face was drooping. In addition, Mary was unable to move her left arm. A stroke team

2.

was called, and fluid was rapidly administered, which raised her blood pressure. Mary was then transferred to University Hospital. Ultimately, Mary suffered a stroke that affected the pons on the right side of her brain—among other areas—resulting in paralysis on the left side of her body.

{¶ 5} On May 29, 2013, appellees filed their complaint alleging that appellant's negligence caused Mary's stroke. Two central issues emerged in the litigation: (1) whether appellant's nurses breached the applicable standard of care, and (2) whether that breach was the proximate cause of the stroke. This appeal concerns the second issue. Appellees' theory is that the prolonged hypotension allowed by appellant's nurses, in conjunction with Mary's existing small vessel disease, caused the stroke. Appellant's theory is that Mary's atrial fibrillation caused a blood clot to form in her heart that was then pumped to her brain where it fragmented, causing the stroke.

{¶ 6} Prior to trial, appellees filed a motion in limine to exclude the hearsay statements included in the University Hospital records, including "the radiologist's imaging interpretations or treating physician medical opinions." Specifically, appellees sought to exclude Dr. Sophia Sundararajan's assessment that

> The patient is presenting with left sided weakness in the peri-operative setting, with a history of atrial fibrillation, currently in a.fib, and off of her Coumadin given the recent fall and SAH. The patient's stent was placed on the left, and given the left sided weakness is not likely a direct

3.

cause of the weakness.  *Her atrial fibrillation is strongly suspected as the cause of this recent stroke.*  (Emphasis added.)

The trial court granted the motion on January 27, 2015.  On May 14, 2015, it clarified its ruling to state that, "[T]he court will exclude as impermissible hearsay any testimony by an expert who testifies as to the opinions of another doctor. * * * [U]nlike the corresponding Federal Evidence Rule, Ohio rule of Evidence 803(6) does not allow medical opinion or diagnosis found in records to be admitted into evidence."  Upon appellant's further motion for reconsideration, the trial court again affirmed its ruling. Relying on *Hytha v. Schwendeman*, 40 Ohio App.2d 478, 320 N.E.2d 312 (10th Dist.1974), the court reasoned

> This is a medical malpractice case in which often times the decision from the jury comes down to a weighing of the expert opinions.  Both the Plaintiff and Defendant have experts in this case.  Such experts are retained to review all the records involved and to opine as to the cause of injury. Those experts testify subject to cross examination.  To allow statements of other doctors into evidence without a full review of their qualifications, knowledge, experience, familiarity with the facts of this case, and not subject to cross examination, would be inconsistent with the rules of evidence, especially in regard to an issue central to the entire case.

{¶ 7} The matter then proceeded to a jury trial over the course of seven days between May 18 and May 27, 2015.  At the trial, Dr. Susan Gallagher, Mary's daughter,

4.

testified for appellees as a fact witness. During her testimony, a series of questions unfolded that led to a discussion about Dr. Sundararajan's opinion as to the cause of Mary's stroke. On cross-examination, Susan was asked, over objection:

Q: [I]sn't it true that no University Hospital's doctors ever indicated to you that the care received by your mom at Firelands was bad, or inappropriate, or negligent?

* * *

A: Oh. There was no discussion about the care at Firelands Hospital.

Q: Okay. So, as I stated that that's true, there was no University Hospital's physician that criticized the care your mom received at Firelands; true?

A: There was no discussion either way.

Then, on re-direct, the following exchange took place:

Q: Then there was some discussion about University Hospitals, and the - whether anybody at University Hospital ever suggested to you that the stroke was caused by hypertension [sic]; remember that?

* * *

Q: I'm sorry. He asked a different question, didn't he?

A: Right.

* * *

Q: He asked a question as to whether anybody at UH talked to you about why your mom had a stroke, or criticized the care at Firelands Hospital, right?

A: He - he asked whether or not there was a criticism of care at Firelands Hospital.

Q: All right. Did you ever take the - to University Hospitals the medical records from the Firelands Hospital so they could see the low pressures from [4:25 p.m.] to one - 1:30 in the morning? Did you ever take those records to UH?

A: No. No.

Q: Did they have that information to your knowledge?

A: Not that I'm aware of.

Q: Then did you talk to one of the doctors about whether she had a hypotensive episode at Firelands Hospital?

A: I was asked in the Emergency Room by the neurologist whether or not she had had a hypotensive episode.

On re-cross examination, the subject was addressed again:

Q: So if - you have told us that with respect to your discussion with the physician at University Hospitals, there was never a discussion relative to the cause of the stroke?

A: There's no - I had no discussion.

6.

Q: There was a question put to you by the - by a physician there as to whether your mom had low blood pressure at Firelands?

A: That's correct.

Q: Did you develop a belief as to what the cause of the stroke was based upon your discussion with that UH physician?

A: The question that was asked of me did your mother have a hypotensive episode because the stroke appeared to be a watershed stroke.

{¶ 8} At this point, counsel requested a side-bar to discuss whether appellant could cross-examine Susan with the University Hospital records showing that Dr. Sundararajan came to the alternate conclusion that the stroke was likely a result of Mary's atrial fibrillation. During the discussion, the parties each argued that the other opened the door to this line of questioning. Ultimately, over appellees' objection, the court ruled that appellant could continue with his examination:

Q: Doctor, very quickly, I want to go back to this discussion you had with a physician at UH, who was that?

A: I call her Dr. Sophia. I don't know her last name.

Q: She was a neurologist?

A: Yes.

7.

Q: And you had a discussion with her; correct?

A: She visited my mom in the emergency room, she was with a resident, and med students, and she asked whether or not my mom had had a hypotensive episode because it looked like a watershed stroke.

* * *

Q: Okay. Were you aware that Dr. Sophie was of the opinion * * * that the stroke was due to a clot from a-fib?

A: No.

{¶ 9} The issue of the University Hospital records briefly arose again with the next witness, Dr. Gregg Zoarski, who was qualified as an expert in neuroradiology. Zoarski testified on cross-examination that he was in agreement with some of the report, such as evidence of diminished flow in the middle cerebral artery, which he testified made her susceptible to the left middle cerebral artery watershed stroke. Zoarski also testified that "the history said like A-fib embolic stroke, or that was what the University Hospital staff were led - it was kind of the story they got. They didn't have all the information about her low blood pressure, et cetera." On re-cross examination, Zoarski continued to testify that the University Hospital doctors prematurely came to the conclusion that the cause of the stroke was atrial fibrillation.

{¶ 10} As to the cause of the stroke, Zoarski testified that it was his belief to a reasonable degree of medical certainty that Mary's stroke in the right pons was not characteristic of a stroke from a clot caused by atrial fibrillation, but rather was

8.

characteristic of "progressive vascular disease exacerbated by prolonged low blood pressure. Not a big enough channel for blood flow to get through, drop the blood pressure, that vessel clots off, and we knew she had underlying vascular disease." In contrast, appellant's expert, Dr. James Gebel Jr., who qualified as an expert as a stroke neurologist, testified that he believed to a reasonable degree of medical certainty that a blood clot formed in Mary's heart, most likely due to her atrial fibrillation, which then fragmented with pieces going up the front and back arteries leading to her brain. Likewise, appellant's expert, Dr. Daniel Brotman, who qualified as an expert as a hospitalist, testified that the stroke "was either caused by atrial fibrillation, or the underlying vascular disease that she had. It was not to a reasonable degree of probability caused by hypoperfusion because she was asymptomatic when her blood pressure was lower, and that is not a watershed area. I've never heard of a watershed stroke occurring in the pons before."

{¶ 11} Following the testimony of the witnesses, the parties moved to enter their exhibits. Relevant here, appellant moved to enter the records from University Hospital, including those containing the opinion of Dr. Sundararajan that the stroke was likely caused by atrial fibrillation. Appellees objected. After a lengthy discussion, the trial court admitted the University Hospital records, reasoning that the records were discussed during the trial and should go to the jury with all of the other voluminous medical records.

9.

**{¶ 12}** The parties then made their closing arguments. Appellant, during its closing argument, and over objection, emphasized the opinion of Dr. Sundararajan:

* * * I would refer you specifically when you look at the University Hospital records to Page 6109. When you have the records back in the jury room you're going to see page numbers on the bottom right-hand corner, this is going to be at Page 6109 in the University Hospital records, important record. This is Dr. [Sundararajan], the stroke neurologist at University Hospitals where she says, The patient is presenting with left-sided weakness in the perioperative setting, with a history of atrial fibrillation, currently in A-fib, and off her Coumadin given the recent fall, and subarachnoid hemorrhage. The patient's stent was placed on the left, and given the left-sided weakness is not likely a direct cause of the weakness.

* * *

Dr. [Sundararajan] indicates in her note, her, Mrs. Gallagher's atrial fibrillation is strongly suspected as the cause of this recent stroke.

So it's not just Dr. Gebel, it's not just Dr. Brotman, it's the University Hospital physicians, and I would submit to you, ladies and gentlemen, that there is one expert in this case. One. Dr. Zoarski. Just one who believes that this stroke was due to low blood pressure. So to believe

the Plaintiff's theory of the case, you need to disbelieve Dr. Gebel, Dr. Brotman, and now Dr. [Sundararajan] at University Hospitals.

{¶ 13} Following instructions from the court, the jury retired to deliberate. The jury returned with a verdict for appellant, with six of the eight jurors finding that appellant's nurses breached the standard of care in failing to notify a doctor of Mary's prolonged low blood pressure, but unanimously finding that the breach was not a proximate cause of Mary's stroke. Notably, in determining that the nurses breached the standard of care, the jury referenced information in the University Hospital records where the medical emergency team was called when Mary's systolic blood pressure was below 90.

{¶ 14} On June 17, 2015, appellees moved for a new trial pursuant to Civ.R. 59, arguing that the trial court erred when it allowed the University Hospital records to be submitted to the jury. Appellees noted that, before the trial, the court properly excluded the records under *Hytha* in that they contained the inadmissible hearsay opinion of an expert witness. Further, appellees argued that a sufficient foundation for the admissibility of the records was not established as no doctor from University Hospitals testified during the trial. Finally, appellees argued that they did not "open the door" to the inadmissible hearsay opinion during their examination of Susan.

{¶ 15} Appellant opposed the motion for new trial, contending that appellees did "open the door." Appellant argued that on re-direct, Susan's testimony left the impression that Dr. Sundararajan had the opinion that Mary suffered a watershed stroke

11.

caused by low blood pressure.  Appellant asserted that it was thus proper to cross-examine her with Dr. Sundararajan's assessment that the stroke was caused by atrial fibrillation, and therefore also proper to admit the University Hospital records containing that assessment.

{¶ 16} On August 10, 2015, the trial court granted appellees' motion for a new trial.  The court reasoned that it was an error of law to allow appellant to cross-examine Susan on whether the University Hospital doctors were critical of the care at Firelands, and to cross-examine Susan with the opinion from Dr. Sundararajan that the stroke was likely caused by atrial fibrillation.  The court further found that appellees did not open the door, but rather it was appellant that invited Susan to discuss her conversations with Dr. Sundararajan.  Finally, the court found that the error was prejudicial because the jury relied on the University Hospital records in determining that the nurses breached the standard of care, and it could not find that it was likely that the jury relied on the records in the one instance, but ignored them in determining proximate cause.  Therefore, the court concluded that "the trial may very well have had a different outcome."

## II.  Assignment of Error

{¶ 17} Appellant has timely appealed the trial court's August 10, 2015 judgment, and now asserts one assignment of error for our review:

> I.  The Trial Court Erred by Granting Plaintiffs' Motion for a New Trial.

12.

### III. Analysis

{¶ 18} In this case, the motion for a new trial was granted pursuant to Civ.R. 59(A)(9), which states that a new trial may be granted upon "Error of law occurring at the trial and brought to the attention of the trial court by the party making the application." "Unlike most other instances in which a trial court decides the question of whether to grant or deny a motion for a new trial, our review of a motion pursuant to Civ.R. 59(A)(9) is de novo, rather than under an abuse of discretion standard." *Ferguson v. Dyer*, 149 Ohio App.3d 380, 383, 777 N.E.2d 850 (10th Dist.2002), citing *Rohde v. Farmer*, 23 Ohio St.2d 82, 262 N.E.2d 685 (1970), paragraph two of the syllabus ("Where a new trial is granted by a trial court, for reasons which involve no exercise of discretion but only a decision on a question of law, the order granting a new trial may be reversed upon the basis of showing that the decision was erroneous as a matter of law."). "[T]he appellate court will reverse the new trial order when the challenged action was not error or was not prejudicial." *Sanders v. Mt. Sinai Hosp.*, 21 Ohio App.3d 249, 252, 487 N.E.2d 588 (8th Dist.1985).

{¶ 19} In the trial court, the parties spent significant time discussing whether the other "opened the door" to the improper line of questioning of Susan regarding the opinion of the University Hospital neurologist. We find these arguments to be inconsequential as the exchange with Susan itself was insignificant in the context of the entire trial, which included the testimony of competing expert witnesses as to causation. Furthermore, although the line of questioning was the hook to introduce the University

Hospital records, "opening the door" is not an exception to the hearsay rule. At most, were we to determine that appellees did "open the door" by asking Susan about her conversation with Dr. Sundararajan, it would only permit appellant to cross-examine her regarding whether she was aware of Dr. Sundararajan's assessment that the cause of the stroke was atrial fibrillation. It would not permit appellant to admit the assumedly inadmissible hearsay medical records from University Hospital. *See Hytha v. Schwendeman*, 40 Ohio App.2d 478, 488, 320 N.E.2d 312 (10th Dist.1974) ("That which is inadmissible because of one evidentiary principle or another, inclusive of the hearsay evidence rule, is rendered no more the salutary by virtue of such evidence being elicited upon cross-examination.").

{¶ 20} The salient issues then, are (1) whether it was error to admit the University Hospital records under the business records exception to hearsay contained in Evid.R. 803(6), and (2) if so, whether the error was prejudicial.

{¶ 21} As to the former, Evid.R. 803(6) excepts from hearsay,

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of

14.

information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

{¶ 22} Relevant here, the 1980 staff notes accompanying Evid.R. 803(6) state,

The Ohio rule departs from the Federal Evidence Rule by deleting "opinions and diagnoses" as admissible under this section. It is not clear how far present Ohio law permits such evidence to be admitted. In *Hytha v. Schwendeman*, (1974), 40 Ohio App.2d 478, 69 Ohio Op. 2d 419, 320 N.E.2d 312, the Franklin County Court of Appeals set forth seven criteria for a diagnosis to be admissible when contained in a hospital record. The *Hytha* case may retain validity in so far as it may assist in determining the point at which, in medical records, an act, event or condition admissible under the exception becomes an impermissible opinion or diagnosis under the rule.

{¶ 23} In *Hytha*, the Tenth District formulated a list of seven factors that must be present before the record of a medical diagnosis made by a physician may be admitted into evidence:

(1) The record must have been a systematic entry kept in the records of the hospital or physician and made in the regular course of business;

(2) The diagnosis must have been the result of well-known and accepted objective testing and examining practices and procedures which are not of such a technical nature as to require cross-examination;

(3) The diagnosis must not have rested solely upon the subjective complaints of the patient;

(4) The diagnosis must have been made by a qualified person;

(5) The evidence sought to be introduced must be competent and relevant;

(6) If the use of the record is for the purpose of proving the truth of matter asserted at trial, it must be the product of the party seeking its admission;

(7) It must be properly authenticated. *Hytha* at syllabus.

**{¶ 24}** Three lines of thought regarding the admissibility of medical opinions and diagnoses under Evid.R. 803(6) have emerged.

**{¶ 25}** At one end of the spectrum, a few appellate districts have held that "Evid.R. 803(6) does not allow for opinions and diagnoses found in business records to be admitted into evidence." *Guarino-Wong v. Hosler*, 1st Dist. Hamilton No. C-120453, 2013-Ohio-1625, ¶ 15, quoting *Meyers v. Hot Bagels Factory*, 131 Ohio App.3d 82, 101, 721 N.E.2d 1068 (1st Dist.1999). *See also Bush v. Burchett*, 4th Dist. Scioto No. 94CA2237, 1995 Ohio App. LEXIS 2488 (June 13, 1995) (trial court erred in allowing expert to read a letter from another doctor expressing that doctor's diagnosis and

opinion). Notably, these decisions do not discuss the *Hytha* factors, or their applicability to Evid.R. 803(6).

{¶ 26} In the middle, several other districts, while stating that "the great weight of authority in Ohio holds that medical opinions and diagnoses are not within the hearsay exception of Rule 803(6)," nonetheless apply the seven-factor test in *Hytha* to determine the admissibility of medical records on a case-by-case basis. *Williams v. Minute Men Select, Inc.*, 5th Dist. Tuscarawas Nos. 2016 AP 03 0016, 2016 AP 04 0020, 2016-Ohio-7509, ¶ 23 (trial court properly excluded medical records of non-testifying doctors who diagnosed or assessed the patient as having reflex sympathetic dystrophy syndrome). *See also Jefferson v. Careworks of Ohio, Ltd.*, 193 Ohio App.3d 615, 2011-Ohio-1940, 953 N.E.2d 353, ¶ 10-13 (10th Dist.) (letter from doctor to lawyer contained in medical records properly excluded); *Ruth v. Moncrief*, 2d Dist. Montgomery No. 18479, 2001 Ohio App. LEXIS 4886 (Nov. 2, 2001) (prejudicial error existed where trial court admitted medical records containing opinions and diagnoses where several of the *Hytha* factors were not met); *Preston v. Lathrop Co.*, 6th Dist. Lucas No. L-04-1129, 2004-Ohio-6658, ¶ 18 (trial court erred in admitting medical records where they did not meet the first *Hytha* factor, but the error was not prejudicial).

{¶ 27} Finally, at the other end of the spectrum, the Eighth District in *Smith v. Dillard's Dept. Stores*, 8th Dist. Cuyahoga No. 75787, 2000 Ohio App. LEXIS 5820 (Dec. 14, 2000), examined *Hytha* and limited the application of its seven factors. The court noted that *Hytha* held, "[A] medical diagnosis, made by a qualified physician and

17.

contained in an otherwise duly authenticated record, is admissible if that statement falls within the general principle of the law of evidence, where such a diagnosis would be admissible if testified to in open court by the person who made the record." *Smith* at *15, quoting *Hytha*, 40 Ohio App.2d at 483, 320 N.E.2d 312. The court also noted *Hytha*'s instruction that

> [T]he overriding consideration is that such diagnosis must be contained either in the records of a hospital, in which records the diagnosis is a systematic entry made in the regular course of the business of the hospital, or the diagnosis must have been entered within the records of the physician making such diagnosis and the diagnosis must be shown to have been entered, and the record kept, within the regular course of the business of the physician. *Smith* at *16, quoting *Hytha* at 483.

{¶ 28} The Eighth District then examined the history of R.C. 2317.40, which is Evid.R. 803(6)'s statutory counterpart, and determined that the omission of "opinions and diagnoses" should not be construed as indicative of an intent to change the principles of Ohio common law. *Smith* at *23. In reaching this result, the Eighth District cited the comments to Fed.R.Evid. 803(6), which relied in part on *Weis v. Weis*, 147 Ohio St. 416, 72 N.E.2d 245 (1947) as grounds for including "opinions and diagnoses." In *Weis*, the Ohio Supreme Court held,

> [T]hose portions of hospital records made in the regular course of business and pertaining to the business of hospitalization and recording

observable acts, transactions, occurrences or events incident to the treatment of a patient are admissible, in the absence of privilege, as evidence of the facts therein recorded, insofar as such records are helpful to an understanding of the medical or surgical aspects of the case, and insofar as relevant to the issues involved, provided such records have been prepared, identified and authenticated in the manner specified in the statute itself. * * *

Such a hospital or physician's office record may properly include case history, diagnosis by one qualified to make it, condition and treatment of the patient covering such items as temperature, pulse, respiration, symptoms, food and medicines given, analysis of the tissues or fluids of the body and the behavior of and complaints made by the patient. *Weis* at 424-425.

{¶ 29} Thus, the Eighth District concluded that "'opinions' and 'diagnoses' contained within medical reports or records fall within the business records hearsay exception of Evid.R. 803(6)." *Smith* at *25-26. "As such, the rules announced in *Weis* and *Hytha* 'supplement' Evid.R. 803(6) to the extent they: (1) apply to the admissibility of medical records and their contents; and (2) have not been otherwise superceded by other evidentiary rules." *Id.* at *26.

{¶ 30} In *Reneau v. Con-Way Transp. Servs.*, 6th Dist. Wood No. WD-07-003, 2007-Ohio-6368, we applied this line of reasoning. In *Reneau*, the disputed evidence was

hospital records containing a psychiatric diagnosis. In our analysis, we cited the holding of *Hytha* that a medical diagnosis in a hospital record is permissible where "such a diagnosis would be admissible if testified to in open court by the person who made the record," and the record is "that of the physician making the diagnosis and [has] been made in the regular course of business." *Id.* at ¶ 32, quoting *Hytha*, 40 Ohio App.2d at 483, 320 N.E.2d 312. In addition, we relied on *Smith*'s emphasis that "the primary determinative consideration is whether the diagnosis was contained in a hospital record which would contain such information in the regular course of business." *Id.* at ¶ 35. We concluded that the records were reliable, and that the diagnosis was of the type that would ordinarily be contained in such records. Therefore, we held that the trial court did not err in allowing them to be entered without redaction. *Id.*

{¶ 31} Turning to the present case, we are inclined to follow our most recent decision in *Reneau*. Here, the parties do not dispute that Dr. Sundararajan's assessment that atrial fibrillation was the likely cause of the stroke would be admissible if she testified in open court.[1] Further, the parties do not dispute that Dr. Sundararajan created

---

[1] Although not specifically raised by the parties, we note that it is questionable whether Dr. Sundararajan's assessment that "atrial fibrillation is strongly suspected as the cause of this recent stroke" meets the standard of probability required for medical expert testimony to be admissible under Evid.R. 702. *See Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 374, 504 N.E.2d 44 (1986) ("This court has clearly stated that medical testimony on the issue of causation should be stated in terms of the probability of the causal relationship."); *Butler v. Minton*, 6th Dist. Erie No. E-05-061, 2006-Ohio-4800, ¶ 17 ("Parties typically ask expert witnesses to state their opinions in terms of a 'reasonable degree of medical certainty' or a 'reasonable degree of medical probability.' However, experts need not use these 'magic words;' the expert's opinion is

20.

the record in the regular course of business. Although appellees argue that the records need to be further authenticated, R.C. 2317.422 provides,

> [T]he records, or copies or photographs of the records, of a hospital, * * * in lieu of the testimony in open court of their custodian, person who made them, or person under whose supervision they were made, may be qualified as authentic evidence if any such person endorses thereon the person's verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution.

The records in this case contained such a certification from Alan Bratnick, Manager of Health Information Services. Therefore, we hold that it was not error to admit the University Hospital records.

{¶ 32} Nevertheless, even if it was error to admit those records, such error was not prejudicial in this case. On the issue of prejudice, appellees contend that through the University Hospital records appellant was able to introduce the testimony of a new expert witness, Dr. Sundararajan, without subjecting her to cross-examination. Further, appellees argue that the jury relied on the University Hospital records in its deliberations as evidenced by its response in the jury interrogatories on the question of whether the

---

admissible as long as it provides evidence of 'more than mere possibility or speculation.'"). However, we need not resolve this question because, as will be discussed below, appellees were not prejudiced by the admission of the University Hospital records containing Dr. Sundararajan's assessment.

nurses breached their standard of care. Thus, appellees conclude that the trial court was justified in granting their motion for a new trial.

{¶ 33} We disagree. In this case, the cause of Mary's stroke was one of the central issues. As noted by appellant, several expert witnesses testified as to causation over the course of several days. For appellant, Dr. Gebel and Dr. Brotman testified that the stroke was likely caused by atrial fibrillation, and was not caused by low blood pressure. For appellees, Dr. Zoarski testified that the stroke was caused by prolonged low blood pressure in conjunction with Mary's progressive vascular disease, and was not caused by atrial fibrillation. All of the experts testified extensively and were subject to rigorous cross-examination on their theories.

{¶ 34} Furthermore, although Dr. Sundararajan's assessment that atrial fibrillation was strongly suspected as the cause of the stroke was not subject to cross-examination, an attempt was made to discredit her opinion through Susan's testimony that, to her knowledge, Dr. Sundararajan did not know about or have the medical records showing the prolonged hypotensive episode, and Zoarski's testimony that the University Hospital physicians reached a premature conclusion without having all of the information.

{¶ 35} Thus, in light of all of the testimony at trial, we cannot conclude with any degree of probability that the additional opinion of Dr. Sundararajan contained in the University Hospital records caused the jury to reach a different result than it otherwise would have if the records had been excluded. Therefore, because we find that the

22.

admission of the University Hospital records was not prejudicial to appellees in this case, we hold that the trial court erred in granting appellees' motion for a new trial.

{¶ 36} Accordingly, appellant's assignment of error is well-taken.

### IV.  Conclusion

{¶ 37} For the foregoing reasons, the judgment of the Erie County Court of Common Pleas is reversed, and the August 10, 2015 judgment granting a new trial is hereby vacated.  Pursuant to App.R. 24, appellees are ordered to pay the costs of this appeal.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.       _____
              JUDGE
Stephen A. Yarbrough, J.

James D. Jensen, P.J.      _____
CONCUR.           JUDGE

            _____
            JUDGE

23.