[Cite as *State v. Roberson*, 2017-Ohio-4339.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                   Court of Appeals No. L-16-1131

       Appellee                                Trial Court No. CR0201503139

v.

Ronald Roberson                          **DECISION AND JUDGMENT**

       Appellant                               Decided:  June 16, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Ronald Roberson, appeals the

June 16, 2016 judgment of the Lucas County Court of Common Pleas convicting him of

domestic violence, aggravated burglary, rape, and participating in a criminal gang.  We

affirm, in part, and reverse, in part.

# I. Background

{¶ 2} On December 18, 2015, Roberson was indicted on one count of domestic violence, in violation of R.C. 2919.25(A) and (D)(5); two counts of aggravated burglary, in violation of R.C. 2911.11(A)(1); one count of rape, in violation of R.C. 2907.02(A)(2) and (B); one count of aggravated robbery, in violation of R.C. 2911.01(A)(1)[1]; and one count of participating in a criminal gang, in violation of R.C. 2923.42(A) and (B). The charges stemmed from Roberson's involvement with two women, A.A. and C.G., and his alleged participation in the Bee Hive gang, a branch of the Crips gang.

{¶ 3} The case was tried to a jury beginning June 13, 2016. The state presented the testimony of 12 witnesses, including officers and detectives who investigated the incidents underlying the indictment; a sexual assault nurse examiner ("SANE"); Detective William Noon, a certified gang specialist; and the two victims. Roberson also presented a witness and testified on his own behalf. The following facts were developed at trial.

## A. August 27, 2015 Events

{¶ 4} Roberson met C.G. in August of 2015. He introduced himself as "Gotti" and asked for her phone number. The day after they met, Roberson called C.G. and asked to come to her house. She assented and the pair smoked marijuana until C.G. asked Roberson to leave. Later that week Roberson came to C.G.'s home with a friend.

---

[1] The state dismissed this count prior to trial.

The three of them smoked marijuana and then Roberson and his friend left. This was the extent of C.G.'s interactions with Roberson prior to August 27, 2015.

{¶ 5} Roberson and C.G. both testified that late in the evening of August 26 or early in the morning of August 27 Roberson went to C.G's home and she voluntarily let him into her home. Beyond that, they presented different versions of the events that occurred.

{¶ 6} C.G. testified that Roberson called her around midnight while she was sleeping. He told her that he was at a nearby gas station and asked to come over. She agreed. When Roberson knocked on the door, C.G. opened it and let him in. He immediately asked to use her bathroom, which was upstairs where her children were sleeping. She said he could, but he did not return after several minutes. She went up to check on her children and found Roberson in her bedroom, not the bathroom. He asked C.G. to sleep with him, but she told him they should take their time before making the relationship sexual. Roberson grabbed C.G.'s hand to pull her toward the bed, started kissing her, removed her underwear, and engaged in vaginal intercourse with her. Although C.G. was not interested in sleeping with Roberson, she did not tell him "no" when he initiated the sexual activity. She claimed that she was scared to fight him because she did not know him well and did not know what he would do if she refused. C.G. did, however, reply "no" when Roberson asked her if she liked what he was doing and she testified that she also said "no" two other times during the encounter. She also scratched Roberson on his side or his back during sex.

3.

**{¶ 7}** C.G. further testified that after Roberson finished he asked to use C.G.'s phone charger, which he retrieved from the first floor. He charged his phone in her bedroom for a brief time and then went back downstairs. C.G. testified that she was scared so she laid in her bed after Roberson went downstairs. C.G. heard voices downstairs, but could not identify how many people she heard or if one of them was Roberson. After the voices stopped, C.G. went downstairs and saw that her front door was open and her TVs, computer, and game system were missing. She later discovered that smaller items from upstairs, including her children's tablets, were also missing. C.G. then texted Roberson, telling him that he had 15 minutes to return her property or she was going to call police. She sent him 14 text messages over the course of approximately 30 minutes. One of the messages said, "And you rapped [sic] me I told you no over and over again." Roberson did not respond to any of the messages.

**{¶ 8}** C.G. testified that she called the police after texting Roberson. Officers responded and took C.G. to the Toledo Hospital to have a rape kit performed. At trial, C.G. read from a certified copy of her hospital records. Although C.G.'s testimony largely matched the information in the hospital records, the records contained some additional details. According to the medical records, C.G. told the SANE who examined her that she had asked Roberson to leave when she found him upstairs. The medical records also described her encounter with Roberson in the bedroom a bit differently. She claimed that Roberson said "come here," grabbed her by both arms, and threw her on the

4.

bed.  The defense did not object to the admission of the records or to C.G. reading from the records.

{¶ 9} Roberson provided a different version of the evening's events.  He testified that C.G. contacted him and asked him to come to her house.  He walked over from a nearby gas station.  When he arrived, the two of them smoked marijuana and engaged in some foreplay.  He claimed that he never asked to use the bathroom.  He also claimed that C.G. suggested they go upstairs to her bedroom where the two engaged in consensual sex.  He testified that C.G. became uncomfortable after they had sex and asked him to leave, which he did.  He did not lock the door when he left.  He claimed he did not take any of C.G.'s property and it would have been impossible for him to take a television, a computer, and a game system with him because he walked to C.G.'s house.

{¶ 10} The SANE who examined C.G. testified at trial.  She said that C.G.'s demeanor when she arrived at the hospital was "very distraught."  She testified that C.G. did not have any physical injuries, which she said is not uncommon in rape victims.  She also testified from the hospital records, which contained her notes of the evening's events as told to her by C.G.  According to the SANE, C.G. had met a man named Gotti approximately a year before.  He called C.G. in the middle of the night and asked to come over.  She agreed.  When Gotti came to the house he asked to use the restroom.  C.G. followed him upstairs and found him sitting on her bed.  Gotti grabbed her by both arms, threw her on the bed, and raped her.  C.G. did not want to make any noise because she did not want to wake her children.  When Gotti finished, he asked to use her phone

5.

charger, which she gave him. When his phone was charged he went downstairs, but C.G. did not know what he did while he was downstairs. C.G. stayed in her room, but could hear noises and voices coming from downstairs. When the noises stopped she went downstairs, locked the door, noticed that some of her property was missing, and called the police.

{¶ 11} The evidence the SANE collected was sent to the Ohio Bureau of Investigation ("BCI"). Two BCI technicians testified to receiving the evidence from the Toledo Police Department ("TPD") and testing it for DNA. BCI found sperm and a mixture of DNA on C.G.'s vaginal swab. Roberson's DNA was found in both the sperm and the DNA mixture. The chance of the DNA belonging to someone other than Roberson is one in 35 quintillion, 470 quadrillion unrelated individuals.

{¶ 12} Detective Rebecca Kincaid investigated C.G.'s rape allegations. Before discussing the details of C.G.'s case, Detective Kincaid explained her background in investigating sexual assaults. Based on that experience, she testified that there is no typical response from sexual assault victims and very few victims display signs of physical injury. Regarding C.G., Detective Kincaid testified that the only information she had about the perpetrator at the time was his nickname of Gotti. She consulted the TPD gang unit to try to determine Gotti's identity. Although there were several men nicknamed "Gotti" in the system, none of them matched the physical description given by C.G.

6.

{¶ 13} Detective Kincaid obtained a search warrant for Roberson's DNA based on the BCI test results. She executed the warrant on December 10, 2015, after Roberson was arrested for the aggravated burglary incident with the second victim in this case, A.A. Roberson said little while Detective Kincaid collected his DNA sample. He did, however, deny knowing C.G. or ever spending time on the street where C.G. lived. Roberson explained at trial that he did not recognize C.G.'s name when Detective Kincaid mentioned it and he believed that C.G.'s house was on a street other than the one Detective Kincaid asked about. It was not until she received the DNA results that Detective Kincaid was able to positively identify Roberson as Gotti.

{¶ 14} Based on these events, Roberson was charged with rape and one count of aggravated burglary.

### B. November 23, 2015 Events

{¶ 15} A.A., the mother of two of Roberson's children, testified about her interactions with Roberson. At the time of trial, A.A. was in jail on a material witness warrant to ensure her appearance at trial. Before A.A. took the stand, her appointed counsel informed the court that A.A. had reluctantly agreed to cooperate and testify.

{¶ 16} A.A. testified that she and Roberson were in a romantic relationship from 2011 to 2015. Though the relationship ended, they maintained contact because of the children. At the time of the November incident, A.A. was approximately seven months pregnant with a child not fathered by Roberson.

7.

{¶ 17} Roberson periodically stayed the night at A.A.'s home to see his children and help get them on the bus in the morning. Roberson spent the night at A.A.'s on November 22, 2015, and returned the next afternoon to pick up some of his belongings. While he was in the house, A.A. returned home and saw Roberson's new girlfriend, Kiara Gray, sitting in a car in front of the house. It is at this point that A.A.'s and Roberson's versions of events diverge.

{¶ 18} A.A. testified that she was upset by Gray's presence at her home and confronted Roberson about it. A.A. claimed that she and Roberson "got into it," which included name-calling and "going back and forth with each other." During the argument, Roberson grabbed her by the neck and shoulder and threw her to the ground. A.A. ran into the house to call the police and Roberson followed. Roberson apologized to A.A., but A.A. told Roberson that she was calling the police anyway. Roberson then grabbed her, threw her up against a wall, and hit her head against the wall approximately four times. She fell to the floor, and he left.

{¶ 19} Roberson recalled the encounter differently. He testified that A.A. was swearing at him and "getting all in my area, in my space." He walked away, telling her he was going to get his things and leave. A.A. continued to call Roberson "disrespectful" while he claimed he was "blowing the situation off." Roberson said that he went inside the house for less than five minutes to see his younger brother and that he never touched A.A. Gray testified and corroborated Roberson's version of events, although she

8.

admitted that she was outside the house and did not see what happened while he was inside.

{¶ 20} After Roberson and Gray left, A.A. called the police. Detective Rick Molnar responded and took A.A.'s statement. She and Detective Molnar both testified that she did not have any visible injuries from the incident and did not go to the hospital that day. The next day, however, A.A. went to the hospital because she was having contractions and back pain and was concerned for the wellbeing of her child. The state asked A.A. to read from a certified copy of her hospital records. Although the narrative in the hospital records was largely the same as A.A.'s previous testimony, it also contained allegations that the perpetrator was A.A.'s ex-boyfriend—whom A.A. identified as Roberson—and that the perpetrator choked her and kicked her in the right side of her stomach. The defense did not object to the admission of the records or to A.A. reading from the records.

{¶ 21} Detective Molnar testified about his investigation of the incident. In addition to testifying that A.A. did not have any visible injuries, he confirmed that she was visibly pregnant at the time. He also testified that A.A. never mentioned another female being present with Roberson.

{¶ 22} Based on these events, Roberson was charged with domestic violence.

## C. December 10, 2015 Events

{¶ 23} A.A. testified that she was afraid of Roberson after November 23. As a result, he was not welcome at her home after that date. Between November 23 and

9.

December 10, Roberson called and texted A.A. numerous times. She did not want to communicate with him and sent him messages that said "quit talking to me" and "don't text me." She also refused to let Roberson see his children at her home; all of his visits with the children after November 23 happened at his mother's house.

{¶ 24} On December 10, 2015, A.A. was in her kitchen cooking. Her boyfriend left the house and, shortly after, Roberson entered through the closed, unlocked front door. A.A. did not immediately notice Roberson; she believed her boyfriend had returned to the house, so she was not concerned about the door opening. After entering, Roberson grabbed A.A. by the neck and began choking her. A.A. claimed that he said "you think what I did to you last time was bad, just watch what I do to you this time" and "think this shit again, think what I did to you last time. Watch what I do to you this time." This continued until Roberson's daughter came down the stairs and pulled at his leg. Roberson then left the house. A.A. testified that the whole incident lasted approximately one minute. When Roberson left, A.A. called the police. Detective Molnar investigated this case as well. He and A.A. both testified that she did not have any visible injuries from Roberson's assault. A.A. never sought medical treatment because of this incident.

{¶ 25} A.A. explained that, prior to November 23, Roberson would call her when he wanted to come over and he would either knock when he arrived or she would unlock the door and he would let himself in. On December 10, Roberson called A.A. at least

twice, but he did not tell her that he was coming to her house. He did, however, follow his normal practice of walking in her unlocked front door.

{¶ 26} Once again, Roberson provided a different version of the evening's events. He testified that he was with Gray that evening and never went to A.A.'s house. He picked Gray up from work around 4:00 or 4:30, picked her children up from school, and then went to Gray's family member's house. He claimed that he was with Gray the entire evening, except for approximately ten minutes when he went to the store. He stated that A.A.'s house was approximately a 20 to 25 minute drive from his location.

{¶ 27} Gray once again corroborated Roberson's version of events. She added that Roberson went to the store around 8:30 or 9:00 p.m. and returned with the items she had asked him to pick up. She admitted on cross-examination, however, that she did not go to the store with Roberson and had no way of knowing what he did while he was out of her presence. Gray also testified that, as Roberson was being arrested on December 10, she told the arresting officers that Roberson had been with her the entire evening. But the investigating officer, Detective Molnar, testified that he never had any contact with Gray and further asserted that no witnesses ever told him that Roberson was not at A.A.'s house on December 10.

{¶ 28} Based on these events, Roberson was charged with a second count of aggravated burglary.

11.

### D.  Participating in a Criminal Gang

{¶ 29} The final count of the indictment involved participating in a criminal gang. The charge arose from Roberson's alleged participation in the Bee Hive gang from January 1, 2010, through December 18, 2015.  The bulk of the state's evidence regarding this charge came from the testimony of Detective William Noon.

{¶ 30} Detective Noon is a certified gang specialist on the TPD's gang task force. He has worked with that unit for over 14 years.  He testified that street gangs have existed in Toledo for 25 to 30 years and there are approximately 20 gangs that claim territory in Toledo.  Gang members wear certain colors, use specific hand signs, often have other affiliation indicators such as tattoos, and hang out in specified areas that the TPD considers the gang's territory.

{¶ 31} Noon said the Bee Hive gang consists of approximately 50 to 55 members, although the number fluctuates because members go to jail, switch gangs, or quit the gang.  Bee Hive territory is in the area bounded by Bancroft Street, Collingwood Boulevard, Central Avenue, and Cherry Street, which includes Rockingham Street.  Bee Hive members wear the color blue and display a hand sign that is made by pressing the first two fingers to the thumb and extending the pinky, which represents a bee's stinger. He also claimed that Bee Hive members are violent and commit the crimes of burglary and domestic violence, though he was unaware of any Bee Hives who had committed sexual assault.  He conceded that not all gang members are violent.  Further, he said that

12.

the TPD gang unit monitors social media websites to identify gang members based on their posts and pictures, and to observe gang members' activities.

{¶ 32} Specific to Roberson, Noon testified that Roberson's street name is Ron Gotti. Roberson has used the name since at least 2010. The only contact Noon ever had with Roberson was a conversation the two had on a street corner in 2012, during which Roberson allegedly admitted that he was a member of the Bee Hive. Detective Noon did not have a written report or any recordings of the encounter. Detective Noon was involved in the investigation of a 2012 federal criminal case against Bee Hive members, but Roberson was not one of them. Additionally, Detective Noon testified that Roberson had not been the focus of any task force investigations since the 2012 federal case ended.

{¶ 33} The state introduced three photographs taken from a Facebook page belonging to "Ron Gotti." Noon said the photos identified Roberson as a Bee Hive member. Each printout indicates when the photo was posted to Facebook, but not when it was taken. In the first photo, a man is holding money in his mouth and raising one hand with the first two fingers pressed to the thumb and the pinky extended. Noon claimed that this was the Bee Hive hand sign. The picture was posted to the site on November 20, 2015. In the second, the same man is holding up his hands. Tattoos are visible on his fingers, but they are difficult to read. Noon testified that they were the words "bee" and "hive." The printout shows the photo was posted to Facebook in October, but the day and year are not visible. The final picture shows two fists with the words "bee" and "hive" tattooed in blue ink on the fingers. The picture was posted to

13.

Facebook on October 14, 2013.  Noon did not remember Roberson having the tattoos in 2012.

**{¶ 34}** Roberson, contrary to Detective Noon's testimony, did not recall ever meeting Detective Noon on a street corner.  He did, however, identify himself as the man in the pictures from Ron Gotti's Facebook page.  Roberson claimed that he had been in the Bee Hive gang, but that he was no longer a member.  He testified that he was last involved with the gang before having children.  He testified to getting the finger tattoos in 2008 or 2009.  Although he uses his mother's Rockingham Street address, he does not reside there.  He admitted to his continued association with Bee Hive members and stated that he spends time in the Rockingham neighborhood because he has friends and family who still live in the area.  Roberson denied active involvement in the gang.

### E.  Outcome

**{¶ 35}** After hearing the evidence, the jury found Roberson guilty of all counts.  The court proceeded directly to sentencing.  It sentenced Roberson to 11 months in prison on the domestic violence count; 9 years in prison on each aggravated burglary count; 9 years in prison on the rape count; and 6 years in prison on the participating in a criminal gang count.  The court ordered Roberson to serve his sentences for the domestic violence, aggravated burglary, and rape convictions consecutively, and his sentence for the participating in a criminal gang conviction concurrently with the other counts.  His aggregate sentence is 27 years and 11 months in prison.

14.

{¶ 36} Roberson appeals the trial court's decision, setting forth four assignments of error:

Assignment of Error One: Appellant was denied Due Process of law because several of his convictions are unsupported by sufficient evidence, and his convictions are also against the manifest weight of the evidence.

Assignment of Error Two: The offense of "participation in a criminal gang," as applied to appellant, violates appellant's First Amendment rights to freedom of speech, expression, and association.

Assignment of Error Three: The trial court erred to appellant's prejudice in denying appellant's motion to sever counts in the indictment for separate trials.

Assignment of Error Four: Appellant's Sixth Amendment right to counsel was violated because he received ineffective assistance of counsel.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 37} In Roberson's first assignment of error, he contends that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. The state counters that it presented sufficient evidence to sustain Roberson's convictions and the convictions are supported by the manifest weight of the evidence. We address each argument in turn.

**{¶ 38}** In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶ 39}** When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id. at* 387. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175, 485 N.E.2d 717 (1st Dist.1983). Although under a manifest weight standard we consider the credibility of witnesses, we extend special

deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

### 1. Domestic Violence

{¶ 40} Under R.C. 2919.25(A), it is a crime to knowingly cause or attempt to cause physical harm to a family or household member. Although domestic violence is generally a fourth-degree misdemeanor, the charge becomes a fifth-degree felony if the offender knew that the victim was pregnant. R.C. 2919.25(D)(2), (5). A person acts "knowingly," regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). A person has knowledge of circumstances when he is aware that such circumstances probably exist. *Id.*

{¶ 41} Roberson contends that the evidence supporting his domestic violence conviction was insufficient for several reasons: Roberson's and Gray's testimony contradicted A.A.'s version of events, A.A. did not have any visible injuries, and A.A. is not a reliable witness because she was jailed before trial on a material witness warrant. The state counters that Roberson's arguments all relate to the witnesses' credibility, which the court does not review in a sufficiency challenge.

{¶ 42} We agree that all of Roberson's arguments relate to the witnesses' credibility. We do not consider credibility in a sufficiency analysis. The jury was in the best position to assess the witnesses' credibility and it determined that A.A.'s testimony was more credible than the testimony of Roberson and Gray. We will not second-guess that determination on appeal.

{¶ 43} We also find that Roberson's domestic violence conviction is not against the manifest weight of the evidence. Although we consider witnesses' credibility when reviewing a manifest weight claim, we still give special deference to the jury's credibility determinations. At trial, Roberson and Gray testified to the same version of the events, but their version was markedly different from A.A.'s version. The jury decided that A.A. was more credible, and we extend special deference to that determination. Moreover, Gray admitted that she was outside and therefore did not see what happened when A.A. and Roberson were inside A.A.'s home. Considering all of this, we cannot find that the jury lost its way and created a manifest miscarriage of justice by convicting Roberson of domestic violence.

## 2. Aggravated Burglary

{¶ 44} Next, Roberson argues that his two convictions for aggravated burglary are not supported by sufficient evidence and are against the manifest weight of the evidence.

{¶ 45} Under the relevant aggravated burglary statute, R.C. 2911.11(A)(1), it is illegal for any person "by force, stealth, or deception" to trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when a

person other than the person's accomplice is present, with purpose to commit any criminal offense, if the offender either inflicts, or attempts or threatens to inflict physical harm on another.

{¶ 46} "Force" is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Any force, however slight, is sufficient to establish the "force" element of aggravated burglary. *See Goins v. State*, 90 Ohio St. 176, 107 N.E. 335 (1914), syllabus (upholding burglary conviction when defendant further opened an already partially-open door to a chicken house). This includes turning a doorknob and pushing open an unlocked door or pulling on a locked door. *State v. Austin*, 6th Dist. Lucas No. L-09-1011, 2009-Ohio-6258, ¶ 22, citing *State v. Lane*, 50 Ohio App.2d 41, 46, 361 N.E.2d 535 (10th Dist.1976) ("Defendant must have forced open a closed but unlocked door. This forcing open may have been accomplished by defendant by using his strength to turn the doorknob and pushing the door open").

{¶ 47} "Stealth" is defined as "'any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission.'" *State v. Harris*, 6th Dist. Lucas Nos. L-06-1402 and L-06-1403, 2008-Ohio-6168, ¶ 93, quoting *State v. Ward*, 85 Ohio App.3d 537, 540, 620 N.E.2d 168 (3d Dist.1993).

{¶ 48} "Deception" means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission

19.

that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact. R.C. 2913.01(A). The deception element can be proven by showing that the defendant received permission to enter the home by using a ruse. *In re J.M.*, 7th Dist. Jefferson No. 12 JE 3, 2012-Ohio-5283, ¶ 17-18 (defendant received permission by asking to use the bathroom); *State v. Dukes*, 3d Dist. Allen Nos. 1-02-64, 1-02-92, and 1-02-93, 2003-Ohio-2386, ¶ 23 (defendant received permission by lying about needing to make a phone call).

{¶ 49} "Trespass," as pertinent here, occurs when a defendant, without privilege to do so, knowingly enters or remains on the land or premises of another. R.C. 2911.21(A)(1). A person's privilege to be on property can be limited to a certain room or area of the property. *State v. Sparent*, 8th Dist. Cuyahoga No. 96710, 2012-Ohio-586, ¶ 9 (privilege limited to certain rooms defendant was contracted to paint); *In re J.M.* at ¶ 12 (privilege limited to using bathroom); *State v. Rhodes*, 9th Dist. Medina No. 1769, 1989 Ohio App. LEXIS 2839, 5 (July 19, 1989) (privilege limited to first floor bathroom). If a defendant's presence at the property is initially lawful, a trespass may nonetheless occur if the defendant's privilege is revoked or terminated. *State v. Petefish*, 7th Dist. Mahoning No. 10 MA 78, 2011-Ohio-6367, ¶ 22. For example, a defendant's privilege is revoked when he commits a criminal offense inside the home. *See State v. Swiergosz*, 6th Dist. Lucas No. L-12-1293, 2013-Ohio-4625, ¶ 18.

20.

**{¶ 50}** To prove the defendant had a "purpose to commit a criminal offense," the state must show that the defendant invaded the building specifically to commit a crime or formed the intent to commit a crime during the course of a trespass. *State v. Fontes*, 87 Ohio St.3d 527, 721 N.E.2d 1037 (2000), syllabus. A person acts "purposely" when it is his specific intention to cause a certain result or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the person intends to accomplish thereby, it is his specific intention to engage in conduct of that nature. R.C. 2901.22(A). Intent can rarely be proven by direct evidence, but it can be inferred from the facts and circumstances surrounding the case. *State v. Teamer*, 82 Ohio St.3d 490, 492, 696 N.E.2d 1049 (1998).

**{¶ 51}** "Physical harm to persons" means any injury, illness, or other physiological impairment, regardless of its gravity or duration. R.C. 2901.01(A)(3). It is possible for the force or threat of force used to commit rape to satisfy the "inflicts, or attempts or threatens to inflict physical harm on another" element of aggravated burglary. *See State v. K.W.*, 12th Dist. Warren No. CA2016-01-004, 2016-Ohio-7365, ¶ 22 (agreeing with trial court's assessment that rape "is an attempt to or threat to inflict physical harm"); *State v. Ruff*, 1st Dist. Hamilton Nos. C-120533 and C-120534, 2013-Ohio-3234, ¶ 32-33, 36 (noting that aggravated burglaries were not completed until defendant inflicted physical harm by raping the victims), *rev'd on other grounds*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892; *State v. Nguyen*, 4th Dist. Athens No.

21.

12CA14, 2013-Ohio-3170, ¶ 108 ("The force or threat of force used to commit the rape could satisfy the requirement for aggravated burglary * * *").

### a. August 27, 2015 Incident

{¶ 52} Roberson contends that his aggravated burglary conviction for the August 27, 2015 incident with C.G. is not supported by sufficient evidence and is against the manifest weight of the evidence because the state failed to prove the "by force, stealth, or deception," "trespass," "with purpose to commit * * * any criminal offense," and "inflicts, or attempts or threatens to inflict physical harm" elements of aggravated burglary.

{¶ 53} First, Roberson claims that the state failed to present any evidence that he trespassed or entered C.G.'s home by "force, stealth, or deception" because C.G. opened her door and voluntarily let him into the house. Based on the evidence, however, the jury could have inferred that Roberson's request to use C.G.'s bathroom was a ruse that he used to get into the house. Lying to gain entry to a home fulfills the deception element of aggravated burglary. *In re J.M.*, 2012-Ohio-5283, at ¶ 17-18; *Dukes*, 2003-Ohio-2386, at ¶ 23. If Roberson gained entry to the home by lying about needing to use the bathroom, he never had privilege to be in the home and committed a trespass by deception the moment he walked through C.G.'s door.

{¶ 54} Alternatively, even if Roberson initially entered C.G.'s home with permission, the evidence still supports the jury's verdict. C.G. testified that she only gave Roberson permission to enter her bathroom, but he nonetheless proceeded to quietly enter

22.

her bedroom. Roberson therefore exceeded the scope of C.G.'s permission, committing trespass. *See Sparent*, 2012-Ohio-586 (when a person's privilege to be in a home is restricted to a certain area, leaving that area constitutes a trespass). And there was sufficient evidence that he committed this trespass by stealth given that C.G. testified that Roberson secretly entered her bedroom without her knowledge. *Harris*, 2008-Ohio-6168, at ¶ 93 (stealth consists of any secret or sly act done to avoid discovery and remain in the residence of another without permission).

{¶ 55} Furthermore, any privilege Roberson had to be in C.G.'s home was revoked when he began raping C.G. A person's privilege to remain in another's home is rescinded when the person commits a crime in the home. *See Swiergosz*, 2013-Ohio-4625, at ¶ 18. As we discuss below, we are upholding Roberson's rape conviction. When Roberson began raping C.G., he lost any privilege he may have had to be in her home and became a trespasser.

{¶ 56} Next, Roberson argues that there was no evidence of him inflicting, attempting to inflict, or threatening to inflict physical harm on C.G. Rape can be the physical harm upon which the state bases an aggravated burglary charge. *See K.W.*, 2016-Ohio-7365, at ¶ 22; *Ruff*, 2013-Ohio-3234, at ¶ 32-33, 36; *Nguyen*, 2013-Ohio-3170, at ¶ 108. The state's proof of a rape is sufficient to support the physical harm element.

{¶ 57} Finally, Roberson claims that the state did not present sufficient evidence that he had the purpose to commit a crime when he entered C.G.'s home. Purpose to

23.

commit a crime need not exist when the offender enters the victim's home; rather, it is sufficient for the state to prove that the offender developed such purpose during a trespass. *Fontes*, 87 Ohio St.3d 527, 721 N.E.2d 1037, at syllabus. Here, there was sufficient evidence from which the jury could infer that Roberson, at a minimum, had the purpose to commit some crime—whether rape or theft—when he entered C.G.'s home, entered the second floor of her home after asking to use the bathroom, or when he snuck into C.G.'s bedroom.

{¶ 58} We therefore find that Roberson's conviction of aggravated burglary related to the August 27, 2015 incident is supported by sufficient evidence.

{¶ 59} Moreover, considering the record and the credibility of the witnesses, we are not persuaded that the evidence weighs heavily against a conviction on this count. While Roberson testified that all of the events of August 27 happened with C.G.'s consent, we cannot say that the jury lost its way in disbelieving his testimony, or created a manifest miscarriage of justice by convicting him. Thus, Roberson's conviction of aggravated burglary of C.G. is not against the manifest weight of the evidence.

### b. December 10, 2015 Incident

{¶ 60} Roberson also argues that the aggravated burglary conviction related to the December 10, 2015 incident lacked sufficient evidence and is against the manifest weight of the evidence because the state failed to prove that he committed trespass "by force, stealth, or deception." Roberson contends that he followed his normal practice of calling

A.A. before coming to her home and either knocking on or opening the door, which, he argues, shows that he neither trespassed nor used "force" to enter the home.

{¶ 61} Although Roberson testified that he followed his normal practice of calling A.A. before coming to her house and letting himself in, A.A. testified that Roberson was no longer allowed in her house after the November 23, 2015 domestic violence incident. A.A. also said that although Roberson called her twice on December 10, 2015, he did not tell A.A. that he was coming to her house. There was, therefore, sufficient evidence for the jury to determine that Roberson was a trespasser at A.A.'s house on December 10, 2105, because A.A. had revoked any prior privilege he may have had to be there.

{¶ 62} We also find sufficient evidence of force. A forcible breaking occurs when a defendant uses *any* force, however slight, to gain entry into a structure. *Goins*, 90 Ohio St. 176, 107 N.E. 335, at syllabus; *State v. Austin*, 6th Dist. Lucas No. L-09-1011, 2009-Ohio-6258, ¶ 22. Thus, evidence that a defendant "us[ed] his strength to turn the doorknob and push[ed] the door open" is sufficient to demonstrate use of force. *Lane*, 50 Ohio App.2d at 46, 361 N.E.2d 535.

{¶ 63} Finally, we find that Roberson's conviction of aggravated burglary is not against the manifest weight of the evidence. We simply cannot say the jury lost its way or created a manifest miscarriage of justice by believing A.A. rather than Roberson, or by finding that Roberson's entry into A.A.'s home was accomplished by force.

25.

### 3. Rape

{¶ 64} Roberson argues that the rape conviction is unsupported by sufficient evidence and is against the manifest weight of the evidence because the state failed to prove that Roberson compelled C.G. to submit to sexual conduct by force or threat of force. The state contends that force can be inferred from the circumstances surrounding the sexual activity.

{¶ 65} A rape conviction under R.C. 2907.02(A)(2) requires the state to prove that the defendant engaged in sexual conduct with another by compelling the other person to submit by force or threat of force. "Force" for purposes of a rape conviction is defined the same way it is for an aggravated burglary conviction—i.e., "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 66} "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus. The force required to commit rape is that which is necessary to overcome the will of the victim. *State v. Muller*, 3d Dist. Defiance No. 4-11-09, 2012-Ohio-3530, ¶ 57. It is a relative term that depends on the age, size, and strength of the parties and their relation to each other. *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus, citing *State v. Labus*, 102 Ohio St. 26, 38-39, 130 N.E. 161 (1921).

26.

{¶ 67} A victim's non-consent to sexual conduct is not required to prove forcible rape; rather, evidence of consent—or lack thereof—goes to the state's ability to prove whether the defendant purposefully forced or compelled the victim. *State v. Hartman*, 2d Dist. Montgomery No. 26609, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 27. Courts have found sufficient force to support a conviction under R.C. 2907.02(A)(2) when defendants engaged in combinations of minimal physical force (e.g., pushing and pulling), removing the victim's clothing, and laying on top of the victim after the victim expressed disinterest in or discomfort with the sexual contact. *E.g., Hartman* (defendant pushed adult victim onto a bed, removed her clothes, laid on top of her, and pulled her into a shower); *Muller* (defendant removed intoxicated adult victim's clothes and did not stop intercourse when victim "batted at him"); *State v. El-Berri*, 8th Dist. Cuyahoga No. 89477, 2008-Ohio-3539 (defendant bent 16-year-old victim over a couch, removed her clothes, and engaged in vaginal intercourse with her); *State v. Rupp*, 7th Dist. Mahoning No. 05 MA 166, 2007-Ohio-1561 (defendant removed adult victim's clothing, laid on top of her, and engaged in vaginal intercourse with her while she attempted to push him away and told him "no"); *State v. Shannon*, 11th Dist. Lake Nos. 2002-L-007 and 2002-L-008, 2004-Ohio-1669 (defendant pushed down 15-year-old victim's partially-removed pants, laid on top of her, and proceeded with intercourse after she replied "uh-uh" to him asking "Is this okay?"). Regardless of the defendant's actions, the state is not required to prove that the victim physically resisted the attack. R.C. 2907.02(C).

27.

{¶ 68} Whether the state proved that Roberson compelled C.G. to submit to sexual conduct by force comes down to credibility. C.G. said that the encounter was not consensual, Roberson grabbed her hand and pulled her toward the bed, he removed her underwear, she told Roberson "no" at least twice during the encounter, she replied "no" when he asked her if she "liked it when he was doing it," and she scratched Roberson during sex. Roberson, on the other hand, maintains that they had consensual sex initiated by C.G., who felt some remorse afterward. The jury believed C.G.'s version of events, which we must honor. On that basis, we find that C.G.'s testimony about Roberson's actions—which included removing C.G.'s underwear, pulling her hand, and continuing intercourse after C.G. told him she did not like what he was doing and said "no" other times during sex—provides sufficient evidence that Roberson compelled C.G. to submit to vaginal intercourse by force.

{¶ 69} Furthermore, after reviewing the evidence and the credibility of the witnesses, we are not convinced that the evidence weighs heavily against a conviction on this count. We cannot say that the jury lost its way or created a manifest miscarriage of justice by believing C.G. rather than Roberson. We find, therefore, that Roberson's conviction of rape is not against the manifest weight of the evidence.

### 4. Participating in a Criminal Gang

{¶ 70} Roberson objects to his conviction of participating in a criminal gang. He asserts that the state did not present sufficient evidence to show that the Bee Hive is a gang, that he actively participated in a gang, that he furthered the purposes of the gang,

28.

that he aided or abetted any gang member in committing criminal conduct, or that he committed criminal conduct himself. The state responds that it sufficiently demonstrated that the Bee Hive is a criminal gang, that Roberson actively participated in the Bee Hive gang, and that he personally engaged in criminal conduct.

{¶ 71} Under R.C. 2923.42(A)

No person who actively participates in a criminal gang, with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity, shall purposely promote, further, or assist any criminal conduct * * *, or shall purposely commit or engage in any act that constitutes criminal conduct * * *.

{¶ 72} The gang participation statute requires proof of four elements: (1) the existence of a criminal gang, (2) appellant's active participation in the gang, (3) appellant's knowledge that the gang engages in or has engaged in a pattern of criminal gang activity, and (4) appellant's purposeful promotion, furtherance, or assistance of, or commission of or engagement in, any criminal conduct.

{¶ 73} A "criminal gang" is defined as

an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:

(1) It has as one of its primary activities the commission of one or more [felonies].

29.

(2) It has a common name or one or more common, identifying signs, symbols, or colors.

(3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.  R.C. 2923.41(A).

{¶ 74} A pattern of criminal gang activity occurs when "persons in the criminal gang have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more" felonies.  R.C. 2923.41(B)(1).  The offenses used to demonstrate a pattern of criminal gang activity must meet certain criteria.  They must include at least one felony; one must have taken place on or after January 1, 1999; the most recent offense must have occurred within five years after at least one of the other offenses; and the two or more offenses must have been committed on separate occasions or by two or more people.  R.C. 2923.41(B)(2).

{¶ 75} Here, although the state established that the Bee Hive is a criminal gang, it failed to present sufficient evidence of the second element of the crime—i.e., that Roberson "actively participat[ed]" in the Bee Hive gang during the period in the indictment.

{¶ 76} The phrase "actively participates" is not defined by the statute.  We recently held, however, that "the active participation element of the criminal gang statute

requires the state demonstrate that appellant actually—not just nominally—took part in the criminal gang." *State v. Smith*, 6th Dist. Lucas No. L-15-1027, 2017-Ohio-776, ¶ 38. Actual participation requires that the appellant perform "some role to benefit the gang." *Id.* at ¶ 39.

{¶ 77} The state relied primarily on Detective Noon's testimony and the Ron Gotti Facebook pictures to support this charge. Detective Noon testified that Roberson admitted Bee Hive membership in 2012; Noon did not recall Roberson having finger tattoos during their 2012 meeting; Roberson was not targeted in the investigation of the 2012 federal case against other Bee Hive members; and the TPD's gang unit had not focused on Roberson at least since the end of the 2012 federal case. He also testified that Bee Hive members engage in a pattern of property crimes and have engaged in crimes against women. Detective Noon identified the territory, hand sign, and color common to the Bee Hive. The pictures from Ron Gotti's Facebook page show Roberson displaying the Bee Hive hand sign and his "Bee Hive" finger tattoos done in blue ink. Though the pictures were posted in 2015, 2013, and an unknown year, there is no indication of when they were taken. The state also presented the testimony of Detective Kincaid, who asked TPD's gang unit to identify "Gotti," the suspect in C.G.'s rape, but the gang unit was unable to identify him.

{¶ 78} Roberson testified that he was a former Bee Hive member, but had not been active in years. He claimed he got the "Bee Hive" tattoos in 2008 or 2009. He did

31.

not recall ever meeting Detective Noon or identifying himself to Detective Noon as a Bee Hive member.

{¶ 79} In its brief, the state points to cases where the courts upheld participating in a criminal gang convictions based on similar circumstantial evidence. These cases are distinguishable, however, because in each of those cases the defendant was convicted based on additional evidence pointing to active—rather than nominal—participation that somehow benefitted the gang. In *State v. Gaiter*, 9th Dist. Summit No. 24758, 2010-Ohio-2205, for example, the court found sufficient evidence to support a conviction based on the defendant's strong ties to other gang members; his tattoos memorializing dead gang members; photos of him wearing gang colors, showing gang hand signs, and standing at a dead gang member's grave with other gang members; and—most critically—evidence that the gang was involved in selling cocaine, the defendant was a cocaine wholesaler, and the defendant was seen loitering with other gang members "in the heart" of the gang's drug territory. *Id.* at ¶ 62-63.

{¶ 80} In *State v. Swain*, 6th Dist. Erie Nos. E-11-087 and E-11-088, 2013-Ohio-5900, the other case the state relies on, we found sufficient evidence of active participation based on a prison report in which defendant admitted his gang membership; photos of the defendant and other gang members depicting them in gang colors, wearing gang-related bandanas, displaying gang hand signs, and showing gang-related tattoos; a gun wrapped in a gang-related bandana recovered from defendant's residence; and clothing taken from defendant's closet that was personalized with the gang's acronym.

32.

*Id.* at ¶ 24, 56. But there was also evidence that the defendant possessed crack cocaine and had prepared crack cocaine for sale, and that gang members with whom he associated also trafficked crack cocaine. *Id.* at ¶ 6, 10, 27.

{¶ 81} In both *Gaiter* and *Swain*, the evidence showed that the defendant was not only currently involved with the gang (clothing, hand signs, tattoos, and pictures with other gang members), but was also doing something to benefit the gang (selling drugs). Here, in contrast, the state failed to present any evidence that Roberson did anything to benefit the Bee Hive gang. The state argues that the jury could infer that Roberson arranged for Bee Hive members to burglarize C.G.'s home based on Noon's testimony that Bee Hive members engage in property crimes and C.G.'s testimony that she heard unfamiliar voices in her home after Roberson left and before she discovered that various items had been stolen. We disagree. Although the jury could reasonably infer that Roberson allowed some other people to enter C.G.'s home, there was no additional evidence from which the jury could infer that the unidentified people were Bee Hive members. Simply put, the state failed to connect Roberson's self-affiliation with the Bee Hive gang (i.e., his tattoos, use of the gang sign, and admission to Detective Noon in 2012) to the aggravated burglary of C.G. or any other any activity that could somehow benefit the gang.

{¶ 82} Indeed, we have consistently required more evidence of active participation than the state presented against Roberson. *E.g., Smith*, 2017-Ohio-776, at ¶ 41-44 (conviction upheld based on observation of defendant with active gang members,

33.

photograph of defendant flashing a gang sign, photograph of defendant's birthday cake decorated with gang symbols, evidence that defendant sold drugs and the gang supported itself through drug sales, and evidence that defendant committed a drive-by shooting with members of the gang); *State v. Nelson*, 6th Dist. Lucas No. L-15-1190, 2016-Ohio-7115, ¶ 41-42 (conviction upheld based on defendant's recorded admission of participating in the gang and evidence that the murder he participated in was in retaliation for a drive-by shooting by a rival gang); *State v. Allen*, 6th Dist. Lucas No. L-14-1078, 2016-Ohio-2742, ¶ 9-10 (conviction upheld based on defendant's participation in recent gang fight, defendant's prior participation in a felony with another gang member, defendant's gang tattoo, tribute to a dead gang member on defendant's Facebook page, photograph of defendant with a gang member who was flashing a gang sign, and evidence that defendant murdered a rival gang member in retaliation for his brother's death).

{¶ 83} In each of these cases, there was evidence that the defendants did more than wear a gang's color, show a gang's hand sign, or have gang-related tattoos; specifically, the evidence showed that the defendants engaged in conduct—from selling drugs to murdering rivals—that furthered some interest of the gang.  Here, the state did not present any evidence that Roberson engaged in conduct that benefited the Bee Hive.  Roberson's tattoos, admission of membership, admission of socializing with Bee Hive members who live in his old neighborhood, and photo of him throwing a gang sign prove *association* with the Bee Hive, but not active *participation* in its activities, which is required for a conviction under R.C. 2923.42.  At best, the state's evidence shows that

Roberson is and was at all times alleged in the indictment a passive, nominal, or former Bee Hive member.

{¶ 84} We find, therefore, that Roberson's conviction of participating in a criminal gang is not supported by sufficient evidence and we reverse on that basis. Roberson's first assignment of error is well-taken, in part.

### B. First Amendment Violation

{¶ 85} Because we find that Roberson's conviction for participating in a criminal gang is not supported by sufficient evidence, his second assignment of error—claiming that the conviction violates his First Amendment rights to freedom of speech, freedom of expression, and freedom of association—is moot.

### C. Motion to Sever

{¶ 86} In his third assignment of error, Roberson contends that the counts in the indictment were improperly joined and the trial court erred in failing to sever them for separate trials. He claims that he was prejudiced because the joint trial of all counts bolstered the state's "thin" evidence on each count. The state counters that any prejudice resulting from the joint trial is negated because the evidence on each count was simple and direct, and because evidence from trials relating to A.A. and C.G. would be admissible at a trial on participating in a criminal gang.

{¶ 87} We review a trial court's decision on a motion to sever for an abuse of discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. Abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or

35.

unconscionable.  *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).

{¶ 88} Two or more offenses can be charged in one indictment under Crim.R. 8(A) if the offenses (1) are of the same or similar character, (2) are based on the same act or transaction, (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or (4) are part of a course of criminal conduct.

{¶ 89} Criminal Rule 14 provides, however, that separate trials shall be ordered if it appears that a defendant is prejudiced by joinder of offenses in one indictment. Because joinder is favored for judicial economy, the defendant bears the burden of claiming prejudice to prevent the joinder and providing sufficient information for the trial court to weigh the right to a fair trial against the benefits of joinder.  *Schaim*, 65 Ohio St.3d at 59, 600 N.E.2d 661; *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus.  A claim of prejudice depends on whether the advantages of joinder and avoidance of multiple trials are outweighed by the right of a defendant to be tried fairly on each charge.  *Torres* at 343.

{¶ 90} The state can use two methods to defeat a defendant's claim of prejudice under Crim.R. 14: the "other acts" test or the "joinder" test.  *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

36.

**{¶ 91}** Under the other acts test, the state must show that evidence of the other charged offenses would be admissible as "other acts" under Evid.R. 404(B) even if the counts are severed for trial. *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1223, 2015-Ohio-1679, ¶ 28, quoting *State v. Townsend*, 6th Dist. Lucas No. L-00-1290, 2002 Ohio App. LEXIS 1633, 21-22 (Apr. 12, 2002). Under the second method, the joinder test, the state can defeat a claim of prejudice by showing that the jury is capable of separating the proof of each crime because the evidence of each crime is simple and direct. *Id.* "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Robinson*, 6th Dist. Lucas No. L-09-1001, 2010-Ohio-4713, ¶ 51.

**{¶ 92}** We find that the trial court did not abuse its discretion in denying Roberson's motion to sever because the evidence of each crime was separate, direct, and capable of being separated—thereby satisfying the joinder test. At trial, the state first presented its witnesses relating to the participating in a criminal gang charge, then presented the witnesses relating to the incidents with A.A., and finished with the witnesses relating to the incident with C.G. The record shows that the state presented its evidence in an orderly fashion and without overlap of testimony or conflation of proof. Roberson does not point to anything that suggests otherwise. We find that the evidence in this case was sufficiently simple and direct to outweigh any prejudice joint trials might have caused Roberson.

37.

{¶ 93} Accordingly, because the evidence of each crime was separate and distinct, we find that the trial court did not abuse its discretion in denying Roberson's motion to sever.[2] For these reasons, Roberson's third assignment of error is not well-taken.

### D. Ineffective Assistance of Counsel

{¶ 94} In his fourth assignment of error, Roberson claims that his Sixth Amendment right to counsel was violated because his trial counsel provided ineffective assistance.

{¶ 95} Properly licensed Ohio lawyers are presumed to be competent. *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62. In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-88. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94

---

[2] Because we find that the state satisfied the joinder test, we need not consider whether it also satisfied the other acts test.

Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).  As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case."  *Id.* at 689.  "Judicial scrutiny of counsel's performance must be highly deferential."  *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 96} Roberson claims that his trial counsel was ineffective because she did not object to the admission of the victims' hospital records or various hearsay statements within those records.  In response, the state contends that the evidence was properly admissible and, in any event, Roberson cannot prove that the result of the proceeding would have been different if the evidence had not been admitted.

### 1.  Hospital Records

{¶ 97} Evidence Rule 901 governs the authentication of evidence and provides, in relevant part, that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the material in question is what its proponent claims."  Evid.R. 901(A).  Under R.C. 2317.422(A),

> the records, or copies or photographs of the records, of a hospital, * * * in lieu of the testimony in open court of their custodian, person who made them, or person under whose supervision they were made, may be qualified as authentic evidence if any such person endorses thereon the person's verified certification identifying such records, giving the mode and time of

their preparation, and stating that they were prepared in the usual course of the business of the institution.

If records are properly certified under R.C. 2317.422(A), no further authentication is needed for them to be admissible. *See Gallagher v. Firelands Regional Med. Ctr.*, 6th Dist. Erie No. E-15-055, 2017-Ohio-483, ¶ 31.

{¶ 98} Here, the hospital records of C.G. and A.A. contain certifications from the issuing medical providers that comport with the requirements of R.C. 2317.422(A), making them properly authenticated and admissible. Thus, trial counsel's failure to object to their admission was, at a minimum, objectively reasonable. Indeed, even if an objection had been raised, the remedy would have been in-person authentication rather than exclusion of the records from evidence. We therefore cannot find that counsel was ineffective for failing to object to the admission of certified hospital records.

### 2. Hearsay Statements in the Hospital Records

{¶ 99} Hearsay statements made for the purpose of medical diagnosis or treatment are admissible under Evid.R. 803(4). This exempts from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." *Id.* For such statements to be admissible under this exception, the declarant's motive must be consistent with that of a patient seeking treatment and it must be reasonable for the medical provider to rely on the information in diagnosing and treating

40.

the declarant. *State v. Ridley*, 6th Dist. Lucas No. L-10-1314, 2013-Ohio-1268, ¶ 49, citing *State v. Clary*, 73 Ohio App.3d 42, 52, 596 N.E.2d 554 (10th Dist.1991). We have previously found that a description of the injuring event and identification of the perpetrator fall within the medical diagnosis or treatment hearsay exception. *Id.* at ¶ 52, citing *State v. Stahl*, 9th Dist. Summit No. 22261, 2005-Ohio-1137, ¶ 15.

{¶ 100} In this case, the statements that A.A. and C.G. read from their medical records described not only the symptoms they were experiencing, but also the events that caused them to seek medical treatment and some reference to the identity of the perpetrator (A.A. identified him as her ex-boyfriend and C.G. identified him as Gotti). Both women made their statements in the course of receiving medical care after being assaulted. The events surrounding the victims' decision to seek medical treatment show that both victims made their statements with the motive of receiving proper treatment and it would be reasonable for a medical provider to rely on the information they provided. Under these circumstances, such statements fall within the hearsay exception for medical diagnosis and treatment.

{¶ 101} Thus, trial counsel's failure to object to the admission of those statements was objectively reasonable. We find this assignment of error not well-taken.

### E. Merger

{¶ 102} Finally, we address an issue that the state brought to the court's attention in its brief: whether the rape and aggravated burglary charges related to the August 27, 2015 incident should have merged for purposes of sentencing. Roberson did not initially

41.

raise the issue or assign it as error, although he did briefly argue this issue in his reply brief.

{¶ 103} An appellate court must determine an appeal on its merits based on the assignments of error set forth in the briefs and will not address mere arguments. *Jensen v. AdChoice, Inc.*, 6th Dist. Lucas No. L-14-1014, 2014-Ohio-5590, ¶ 23, fn. 4, citing App.R. 12(A)(1)(b); App.R. 16; *Bonn v. Bonn*, 10th Dist. Franklin No. 12AP-1047, 2013-Ohio-2313, ¶ 9; and *Firsdon v. Mid-American Natl. Bank*, 6th Dist. Wood No. WD-96-009, 1996 Ohio App. LEXIS 5583, 6, fn. 1 (Dec. 13, 1996).  Roberson did not assign as error the trial court's failure to merge his convictions of rape and aggravated burglary related to the August 27, 2015 incident.  Therefore, we will not address his "mere arguments" on this issue.  *Jensen* at ¶ 23, fn. 4.

### III. Conclusion

{¶ 104} The January 29, 2016 judgment of the Lucas County Court of Common Pleas is affirmed as to Roberson's convictions for domestic violence, aggravated burglary, and rape and reversed and vacated as to his conviction for participating in a criminal gang.  The parties are ordered to divide the costs of this appeal equally pursuant to App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

State v. Roberson
C.A. No. L-16-1131


 

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Arlene Singer, J.                       _____
                                                                  JUDGE

Thomas J. Osowik, J.

                                          _____
Christine E. Mayle, J.                  JUDGE
CONCUR.

                                          _____
                                                                   JUDGE