[Cite as *In re L.F.*, 2019-Ohio-304.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY


In re L.F.

Court of Appeals No. S-18-006

Trial Court No. 21620548


**DECISION AND JUDGMENT**

Decided: February 1, 2019

* * * * *

Howard C. Whitcomb, III, for appellant.

Timothy Braun, Sandusky County Prosecuting Attorney,
Mark E. Mulligan and Rachel J. Dewey, Assistant Prosecuting
Attorneys, for appellee.

* * * * *

**JENSEN, J.**

**{¶ 1}** L.F. appeals from his adjudication in the Sandusky County Court of

Common Pleas, Juvenile Division, for rape in violation of R.C. 2907.02(A)(2), a felony

of the first degree if committed by an adult. L.F. claims that his adjudication was against

the manifest weight of the evidence, the victim's testimony was not credible, and that

appellant's statements to the investigating officer should have been suppressed because they were "illegally obtained." For the following reasons, the juvenile court's adjudication is affirmed.

{¶ 2} On September 2, 2016, Sandusky County Sheriff Deputy Brandon Kimmet was dispatched to Fremont Ross High School in response to a call from a school guidance counselor that appellant, a then sixteen-year-old male student at Fremont Ross, may have had sex with A.W., a then fifteen-year-old female student at the school, without her consent. The sexual encounter was alleged to have occurred at appellant's parents' cottage on Marina Drive, Fremont, Sandusky County, on August 29, 2016. Deputy Kimmet authored a written report and forwarded the matter to Sandusky County Sheriff Detective Kenneth Arp for investigation.

{¶ 3} On September 17, 2016, Detective Arp interviewed A.W. In his written report, Detective Arp summarized A.W.'s statements, in part, as follows:

> [A.W.] advised that on the day before school started [appellant] sent her a text message asking her to come over to his place at the campground. [A.W.] then drove her golf cart over and she advised that [appellant] was sitting outside of his clubhouse and when she got there he came up and gave her a hug and told her he was really horny. [A.W.] stated that he told her he wanted to do it and that he wanted to know what it felt like. [A.W.] advised she then pushed him away and told him no and that they weren't doing it. [Appellant] then asked [A.W.] to come inside their clubhouse so

2.

that they could talk and they both walked inside. Once inside the clubhouse [A.W.] advised that [appellant] shut off the lights. [A.W.] advised there was a small amount of lighting due to a light being on that kills insects. [A.W.] advised that he turned around and shut the door and she advised it looked like he may have locked it but she wasn't sure. [A.W.] advised that [Appellant] then began to take off her clothes while they were both standing up. At that point [A.W.] advised she told [appellant] no and that she didn't want to do it. She advised [appellant] told her its fine and that he would be gentle. [A.W.] advised she told him she didn't care she just didn't want to do it. [A.W.] advised around this time [appellant] received a phone call from his Grandpa and he told his Grandpa to give him 5 minutes. [A.W.] advised that at this time he got off the phone and laid her down. [A.W.] advised that once [appellant] took off her clothes he then took off his clothes. At this time [A.W.] advised that she just couldn't believe this was happening and she couldn't speak. [A.W.] advised that once [appellant] had his clothes off he put a condom on and then had sex with her. [A.W.] advised that the whole thing happened very fast and that she was just in denial while it was happening.

{¶ 4} During the interview with Detective Arp, A.W. acknowledged that she and appellant had communicated on at least three occasions after the incident both by text and in person.

3.

{¶ 5} On the afternoon of September 20, 2016, Detective Arp drove his patrol car out to appellant's home at 22 Marina Drive in the Riverfront Marina in Fremont, Ohio. Appellant was in the driveway. The detective turned on his audio recording device, exited his patrol car, and introduced himself to appellant. Detective Arp informed appellant that he had taken a complaint from A.W. He asked appellant if he knew what the complaint was about. Appellant indicated in the affirmative. Detective Arp then said, "Here's the deal, before we go anywhere with this, I'm not here to arrest you, I'm just here, more or less, just to get your side of the story. So, if you want to talk, you can tell me your side, she kind of told me her side of the story. Um, you don't have to talk to me, per se. I'm out here – I'm just out here more or less to hear your side of the facts." Appellant agreed to speak with the detective, indicating that he "had nothing against any of you guys" and was "raised to tell the truth." Detective Arp then suggested that they go inside appellant's home, Appellant agreed. Appellant's parents were not at home. After asking appellant his age, Detective Arp stated:

Um so, like I said, you are not under any obligation, um, to discuss anything, I just – I thought I'd come out here and get your side of the story. She came out and told me hers. Um, you know, I'm not – you are not under arrest, I'm not out here to arrest you. I'm just out here more or less to – from your perspective – to hear what happened, um and see if it's the same, or see if it differs. Or, just to get your side, there is always two sides to every story.

Appellant responded, "It was just a dumb honest mistake at the time. At the age that we're at now, it just it just seems like its what's on everybody's mind and it was on my mind and wrong time, wrong place, should never have been there. I'm not raised to be like that. It was one just one of those stupid idiotic moments." Detective Arp then asked appellant what he was referring to as "a stupid moment." Appellant stated, "I just simply asked her if she wanted to, she was kind of hesitant about it, and I guess I kind of provoked her into doing it, I guess. I don't know." Appellant indicated that it was the first time that he had had sex. The following are excerpts from the audio recording of the interview.

Detective: So, she tells me that on the day that it happened you guys go in there, its dark. She says that you start to take off her clothes and she gives you the "whoa, whoa, whoa."

Appellant: Yes and no. I don't think at the moment she was kinda like "whoa, whoa, whoa," we were both kind of hesitant [inaudible].

Detective: Ok. So where did it progress from there?

Appellant: As in, what?

Detective: As in, you guys went into the club house and then what happened?

Appellant: Nothing, you know, we were just, whatever, making out, whatever you call that -- and it went from there?

Detective: Ok. But it wasn't consensual?

Appellant:  As in, like, a continuous thing?

Detective Arp:  As in the both of you, consenting, as in the both of you wanting to have sex.

Appellant:  Her and I, we went out for, I don't know, a couple of weeks or so.  We talked about it.  I was like hey, we should give this a try * * *.

Detective Arp:  Did you take her clothes off?

Appellant:  Yes and no.  Kind of, mostly, I don't know, I guess.

Detective:  Well, so the clothes are off.  I assume you took your clothes off.

Appellant:  Yes sir.

Detective:  Um, but she never gave consent, so to speak.

Appellant:  Kind of, I guess.

Detective:  I mean, I guess my question is did she ever say yes lets go ahead and do it, I'm ready.

Appellant:  No, no, you know it was kind of [inaudible] kind of iffy about it.

Detective:  Ok. Well, what she had told me was that at one point she had said something – it may not be verbatim – it was something to the effect of, I don't want to do this yet or I'm not ready for this yet.  Something, something along those lines.  And, more or less, she said you

were persistent in wanting to have sex and once clothes started coming off she said that she kind of went silent and she kind of lost her words, so to speak. Is that accurate?

Appellant: Yea.

Detective: Ok. So, so in your eyes, where did it ever go from when she first said something to effect of no, do you remember what she said?

Appellant: She was like, I don't know how I feel about it. I told her I was like I don't know how I feel about it either. I guess it was just the hormones. I know for sure that if I could go back in time, I would have to slap the crap out of myself. I know what I did was wrong. I know I should have never done it. [inaudible] I know that it was wrong. [inaudible].

Detective: Why do you feel it was wrong?

Appellant: Both of us both weren't ready * * * it should have never happened.

{¶ 6} Almost 20 minutes into the conversation, Detective Arp asked appellant for his date of birth, address, phone number, school, grade, and place of employment. He also asked appellant for his parents' contact information. Twenty-five minutes into the conversation, Detective Arp asked appellant when he expected his parents to arrive home. Appellant asserted that his dad would be home soon. Detective Arp then indicated,

Well, um, here's the deal, I'm gonna have to speak to them as well, you know, because you are a juvenile. I would love to speak with them,

number one, because I would have to anyways, but number two, that was one thing her dad said he just wants kind of everyone to be on the same page.

At that time, Detective Arp asked appellant to call his dad. Appellant agreed. Appellant's father arrived at the home about eight minutes later. Detective Arp informed appellant's father of A.W.'s allegation and that appellant's version of events was similar to A.W.'s allegation. Appellant's father asked numerous questions about what would happen next. Before leaving, Detective Arp requested that appellant have no contact with A.W.

{¶ 7} On September 29, 2016, Detective Arp filed a rape charge with the Juvenile Division of the Sandusky County Court of Common Pleas. A trial was held before a magistrate on September 14, 2017.

{¶ 8} At trial, Detective Arp testified that he spoke to the victim and both of her parents before he questioned the appellant. A copy of the report he authored after his interview with the victim was entered into evidence. The audio recording of Detective Arp's conversation with appellant was played in court and entered into evidence.

{¶ 9} On cross-examination, Detective Arp admitted that A.W. never mentioned her thoughts of suicide, the blood on her body, or that she took off her own bra during the encounter. He further admitted that he never looked in the clubhouse nor did he look to see whether the door to the shed had a lock.

8.

{¶ 10} A.W. testified that after appellant invited her over to his home in the campground, he greeted her with a hug and exclaimed that he was "horny." She explained:

> [S]o I kind of backed up and felt really uncomfortable, and I said, no, I don't – okay, I didn't know what to say, I was just stuttering, so he goes, let's just go in the shed – the shed or the clubhouse, and I said, no, I'm not comfortable with that. I'm – I'm in a relationship with someone else, too, so I – that's not faithful. I said, no, and then he said – he said, okay, fine, then let's just talk, so he kind of * * * just had his hand, um, on my upper back and kind of just, like, ushered, slash, guided me into the clubhouse type of thing.

After her eyes adjusted to the darkness, A.W. realized that there were cushions in the corner of the clubhouse. She also noticed a box of condoms on the shelf. As she was looking around, A.W. heard appellant shut the door. At that moment, A.W. began to panic. She explained, "I thought he was messing with [the door], because he either couldn't shut it or if he locked it." When asked whether she felt free to leave, A.W. asserted, "I just – I figured since he was – he – because he locked it, so I did not feel free to leave."

{¶ 11} A.W. explained that after appellant locked the door, he started taking off her pants and shirt. Appellant had trouble with A.W.'s bra and said "I can't get it, you get it." So A.W. took off her own bra "because, um, he's bigger than me in size and

9.

muscle, so I was afraid that if I didn't comply, then he would use force."   A.W.

explained that after her clothes were off,

> [H]e kind of, like, ushered me to the cushions, and then he said, lay down,
>
> so I – I obeyed, and I laid down, and then * * * he had a phone call from his
>
> grand – grandfather, and then he got up to answer his phone, and that's
>
> when I kind of sat up and wanted to, like, get my clothes on.

A.W. testified that appellant was standing "right in front of the door" with his hand out.

In her mind, his hand gesture "was like, stay there."  A.W. explained that when appellant

was done with the phone call, "that's when he got on his knees and proceeded to, um,

have sex."

> {¶ 12} After the sex was over, A.W. explained,
>
> I got up quickly, I didn't care if my clothes were on the right way, I just
>
> needed to, like – get out of there, so I got out, and I got on my golf cart and
>
> I drove back to my house – or cottage, and um, as soon as I got in the
>
> cottage, I just locked myself in the bathroom, and I took off those clothes,
>
> and I just remember seeing all of, like, my blood all over my body because
>
> of when – cause that was my first time, so I – I bled and he – his hands
>
> must have got in the blood, so it was like all over my body, and I just
>
> remember feeling disgusted with myself and the situation, so I just started –
>
> I got a washcloth, and I was, like, washing my body, and I was looking for

Peroxide and – to get the blood off me, then I saw pills and I just – I wanted to commit suicide right then and there.

{¶ 13} When A.W.'s parents got home, she "acted like everything was fine." A.W. testified that the next day was the first day of school so she tried to focus on that. A few days after the incident, A.W. shared what had happened with her school counselor. The counselor informed A.W. that she would have to notify her parents and the police.

{¶ 14} After she spoke with the guidance counselor, A.W. had the following text message exchange with appellant:

> A.W.: hey
>
> Appellant: Hi
>
> A.W.: so…Monday…
>
> Appellant: Yea sorry about that
>
> A.W.: wym
>
> Appellant: I should've have done that it was wrong
>
> A.W.: yea…pretty sure that you did it out of horniness rather than out of you actually meaning any of that stuff that you said
>
> Appellant: Sorry
>
> A.W.: wow

After the text message exchange, A.W. went on a ride on her golf cart to "clear her head." She drove the golf cart past appellant's home. A.W. testified:

11.

[Appellant] was outside right where the clubhouse area was, and he was like, hey, come here, and I didn't want to, but I was just – but he was just like, come here, so I – I was like, okay, what, so that's when he started apologizing, saying, I know I messed up, and I'm really sorry. I've been walking around with this guilt for three days and all this stuff, and I didn't know what to say, so I just left, and I just went back to my cottage and – that was it.

A few hours later, A.W. engaged in another text message exchange with appellant:

A.W. you ass sorry does not get me my virginity back. I didn't want to have sex and you put me in a position of where I was forced to do so. YOU had to live with the guilt for two days? I had to deal with the mental and physical pain for two days and act like I'm fine when in all honesty every time I see you I panic and want to run away and hide. excuse me for saying this, but I don't feel bad for you

Appellant: I know you don't and if I was you I wouldn't either like I said I know I fucked up

{¶ 15} On December 30, 2016, A.W. engaged in the following text message exchange with B., a high school friend:

A.W.: I was picking syd up from her house and [appellant] pulled in and as i walked to the car he slowed down and I think we made eye contact and i kind of smiled. i smiled to show him that i'm over it and that i'm

moving on with my life. i'm honestly over this whole thing and i just want us to be friends again.

B.: Wait till after court and see if y'all can be friends again

A.W: but what if he's mad at me like how he was mad at you?

B.: If he's mad at you like he was me than he'll forgive you like he forgave me

A.W.: after months. ugh my anxiety

B.: it'll all be worth it in the end

A.W.: i'm so scared i miss his protective self

B.: There's nothing to be scared of

A.W.: he probably hates me and his parents will never let us be friends

B.: We'll see about that

A.W.: wym

B.: I texted him but he answers imma ask him if ya'll have any chance of being friends again when this all blows over

A.W.: thank you so much baby

A.W. had a second relevant text message exchange with B. on January 17, 2017:

A.W.: I saw [appellant] driving off with some girl in his car. do you know who?

B.: what'd she look like

A.W.: she had short hair kinda like araya but she had a white scarf around her neck and I think a red plaid flannel

B.: what color hair

A.W.: brown with a blonde streak i think

B.: It might have been [L.H.]

A.W.: who's that dude i'm so pissed

B.: she's on the bowling team with him

A.W.: like no joke. idk why i'm so fucking pissed

B.: I was too the first time I saw them together

A.W.: why the fuck is he giving her a ride?

B.: They probably had practice or some shit

A.W.: i'm still pissed

B.: Don't let it get to you

A.W.: too late I fucking hate myself tho i still like him

B.: I figured you did

A.W.: fml. i know it won't work out but yet I still with it

B.: Who knows the dude. Maybe once this shit is over and y'all can talk again you can ask him and hope for the best

A.W.: let's hope. but would I look like a whore for saying all that stuff happened then turn around and date him?

B.: It's call your forgive and forget. It doesn't make you a whore or anything. Yeah it seems weird but so does dating your cousin but shit happens so who knows

A.W.: true. Plus their opinions aren't shit to me

B.: Once all this shit is over everything will be closer to normal again and we'll all be back to the way we were

A.W.: i really hope so. Hopefully the no contact order will go away

B.: It should

A.W.: I really hope so

{¶ 16} When asked what she was feeling when she was sending the text messages to B., A.W. explained, "very confused because I wasn't seeking counseling at that point yet and the only person that I ever really talked to was my friends who knew of the situation, but they don't actually know how to handle it * * * It wasn't until late February, beginning of March that I actually got mental help."

{¶ 17} On cross-examination, A.W. clarified that when she arrived at appellant's home he hugged *and kissed* her when she arrived at his home. She admitted that she kissed him back. A.W. explained, "that's when he told me that he was horny, and that's when I kind of pushed back, and I said – I got really – really uncomfortable, and I was, like, good, for you. I didn't know what he wanted me to do about that, so I just backed up." Appellant proclaimed, "let's have sex." A.W. replied, "No, I'm not comfortable with that."

{¶ 18} A.W. clarified that initially, she was comfortable going into the clubhouse and she did so voluntarily. When asked why she went in, A.W. indicated, "[be]cause I assumed and hoped that he had just dropped it and went back to his usual self, which was his, like, a friendship type way."

{¶ 19} A.W. indicated that appellant took his clothes off first, then he started to take A.W.'s clothes off too. She explained that he started by pulling her pants down. When appellant got them to her ankles, A.W. stepped out of her flip-flops. Then, appellant started to take off A.W.'s tank top. A.W. raised her arms to allow appellant to take both her tank top and her camisole off over her head. Appellant was unable to unclasp A.W.'s bra, and told A.W. to take it off. She did. Appellant removed A.W.'s underwear. Thereafter, the following exchange then occurred between A.W. and counsel for the defense:

Q. So he was completely naked at the time he was removing your clothing?

A. Correct.

Q. At that time, did you say, no, no, no, I don't want to do this and try to run out?

A. I couldn't.

Q. Why couldn't you?

A. Because I was never put in that situation before, and I didn't know how to react.

16.

Q. Okay. But did you say, no, no, no, I don't want to do this?

A. I couldn't speak.

Q. Okay. Did he threaten you at any time?

A. No.

Q. Okay. Did he manhandle you and try to harm you in any way?

A. No.

{¶ 20} A.W. explained that just as they were laying down on the cushions, appellant received a phone call from his grandfather. Appellant stood up to talk to him. A.W. sat up.

Q. Okay. And what was – what was [appellant] doing during this time?

A. He was talking to him, and when I went to sit up, he just had his hand out to me, he kind of gave me a like a side glance as he was still on the phone.

Q. Okay. A side glance, what – what like he was going to hurt you?

A. That's how I took it.

Q. He was going to hurt you?

A. I didn't know what he was going to do if * * * I did get up.

* * *

Q. Okay. So when the phone call ended, tell us what happened at that point.

A. He hung up the phone, and then he approached me, and, um, that's when he proceeded to have sex.

Q. Okay. And, well, describe what happened. I mean, I want to know.

A. Well, it's like normal sex when a guy enters a girl, that's what happened.

Q. Okay. Did you cry out?

A. Cry out as in for help or –

Q. Yeah, cry out –

A. – in pain?

Q. – at all?

A. No, 'cause – there was no one around.

{¶ 21} On redirect, A.W. indicated that when she went into the clubhouse she did not want to have sex with appellant, nor did she ever consent to having sex with him.

{¶ 22} Appellant did not testify at trial.

{¶ 23} Appellant's mother testified that the clubhouse door did not have a doorknob on August 29, 2016, that the doorjamb was broken, and that the door could not be locked.

{¶ 24} The magistrate issued a decision on September 21, 2017, finding appellant delinquent of the offense of rape.

18.

{¶ 25} On October 3, 2017, appellant filed timely objections to the magistrate's decision. A supplement to the objections was filed, with leave of court. On January 18, 2018, the trial court issued a decision affirming the magistrate's decision and adopting the same as the judgment of the court. The trial court placed appellant on community control until further order. While on community control appellant is required to complete 50 hours of community service, complete the "Harmful Sex Behavior" program, submit a DNA sample, cooperate with an assessment, and register as a Tier II juvenile sex offender. Appellant was committed to 90 days in custody, with credit for 4 days served. The remaining days were stayed, subject to successful community control. Appellant was further given a "suspended commitment to the Ohio Department of Youth Services for a period of a minimum of 1 year, to a maximum of his 21st birthday."

{¶ 26} A notice of appeal was filed February 14, 2018. Appellant presents three assignments of error for our review.

### First Assignment of Error

{¶ 27} In his first assignment of error, appellant asserts:

> The trial court committed reversible error when it found that the prosecution had proven each element of the charge beyond a reasonable doubt.

{¶ 28} Appellant was found delinquent for committing rape, in violation of R.C. 2907.02(a)(2), which states in pertinent part, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or

threat of force." Appellant contends that the state failed to prove the elements of force or threat of force and venue.

{¶ 29} In *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), the Supreme Court of Ohio explained, "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *Id.* at paragraph one of the syllabus.

{¶ 30} Recently, in *State v. Roberson*, 6th Dist. No. L-16-1131, 2017-Ohio-4339, ¶ 67, we held:

> A victim's non-consent to sexual conduct is not required to prove
> forcible rape; rather, evidence of consent—or lack thereof—goes to the
> state's ability to prove whether the defendant purposefully forced or
> compelled the victim. *State v. Hartman*, 2d Dist. Montgomery No. 26609,
> 2016-Ohio-2883, 64 N.E.3d 519, ¶ 27. Courts have found sufficient force
> to support a conviction under R.C. 2907.02(A)(2) when defendants engaged
> in combinations of minimal physical force (e.g., pushing and pulling),
> removing the victim's clothing, and laying on top of the victim after the
> victim expressed disinterest in or discomfort with the sexual contact.

{¶ 31} Here, whether the state proved that appellant compelled A.W. to submit to sexual conduct by force comes down to credibility. At trial, A.W. testified that after appellant invited her to his parent's cottage in the campground, he greeted her with a hug,

20.

a kiss, and an exclamation that he was "horny." His words made her "uncomfortable." Nonetheless, A.W. voluntarily entered the clubhouse with appellant.

{¶ 32} A.W. testified that she started to "panic" after appellant shut the door. She thought that the door might be locked. She indicated that she did not feel "free to leave." When appellant began taking off A.W.'s clothes, he asked A.W. to "get" her bra off. She testified that she complied with appellant's request because she was afraid that if she did not comply appellant would "use force."

{¶ 33} After appellant "ushered" A.W. to the cushions, he answered a phone call. When A.W. sat up, appellant "put out his hand." In her mind, appellant's gesture was instructing her to "stay" on the cushions. A.W. indicated that when appellant put his hand out he gave her a "side glance" that she took to mean that if she got up he was going to "hurt" her. On redirect, A.W. asserted that she did not want to have sex with appellant, nor did she ever consent to having sex with him.

{¶ 34} Upon review of the evidence presented at the adjudicatory hearing, we find that a rational trier of fact could have found the element of force proven beyond a reasonable doubt. Thus, appellant's first argument under his first assignment of error is not well-taken.

{¶ 35} In regard to the element of venue, careful review of the record reveals that at approximately 18:00 minutes into appellant's recorded interview with Detective Arp, appellant confirmed that his address was 22 Marina Drive, Fremont, Ohio. Further, A.W. testified that on August 29, 2016, she was staying with her parents in a campground on

21.

the Sandusky River in Fremont, Sandusky County, Ohio. A.W. further testified that appellant lived in the same campground and that the acts occurred in a "clubhouse" behind appellant's parents' home. Given the testimony, a rational trier of fact could have found the element of venue proven beyond a reasonable doubt. Appellant's second argument under his first assignment of error is not well-taken.

**Second Assignment of Error**

{¶ 36} In his second assignment of error, appellant asserts:

The trial court abused its discretion in finding that the victim's testimony was credible at trial.

In support of his argument appellant asserts:

It is interesting to note that no medical and/or mental health professional was presented to testify that the victim suffered from a particular trauma or mental health issue that could explain her unusual and/or unexpected action after the alleged "rape." The victim's claims after the alleged "rape" are inconsistent with rape victims who actually experience and suffer such a traumatic experience. As such, the following specific aspects of her testimony (and therefore credibility) at trial mandate a finding of the existence of reasonable doubt as to the element regarding "the use of force":

(1) Despite claiming that she was "afraid" of Appellant, the victim texted the Appellant several times after the August 29, 2017 incident * * *.

22.

(2) Although she testified otherwise * * * the victim had at least one face-to-face contact with the Appellant after the * * * incident.  She testified that she went to the Appellant's home and had a face-to-face conversation shortly after reporting the * * * incident to her school guidance counselor * * *.  Obviously, such a voluntary action does not support actual fear of the Appellant whatsoever.

(3) The victim never told her parents, the investigating detective or her guidance counselor of any 'thoughts of suicide' after the * * * incident * * *.

(4) Knowing the existence of a no contact order, the victim initially testified that she never attempted to communicate with the Appellant through a third person after the incident * * *.  This was shown to be untrue.  The victim asked her friend, [B.], to contact the Appellant regarding the school parking pass and as well as his "being with another girl" * * *.

(5) Although she claimed to be afraid of the Appellant, it was shown that her actions (text messaging) after the August 29, 2017 incident did not support such a claim * * *.

(6) Although her story varied, depending upon whom she was speaking with, the victim voluntarily assisted in removing her outer clothing (2 tops) and removing her bra and panties.

(7) There were no threats of harm made to the victim at any time during the * * * incident * * *. The victim never attempted to call the police or her parents immediately following the * * * incident, although she had ample opportunity to do so * * *.

(8) There is no evidence of any injuries to the victim although she "claimed" that there was a lot of blood and she had to lie to her parents about "the bloody things in the trash" * * *.

(9) There were no medical records supporting her claimed that she had been "raped" nor was there any evidence that she sustained any injuries * * *.

(10) The victim "pursued" the Appellant through text messages with [B.] and face-to-face communications with the Appellant after the * * * incident to the point that she wanted to "forgive and forget" and be back with (and "Date") the Appellant again * * *.

(11) The victim lied to Detective Arp about seeing a condom being used by the Appellant * * *.

(12) At trial, upon direct examination, the victim testified that the Appellant "ushered or assisted" her to go into the clubhouse by putting his hand on her back * * *. Under cross examination, the victim changed her story and acknowledged that she voluntarily hugged and kissed the Appellant and entered the clubhouse on August 29, 2017 on her own

volition * * *. The victim never told Detective Arp or her school guidance counselor (Leslie Blanton) that she was "ushered or assisted" into the clubhouse * * *. The victim also testified that the Appellant never pushed, grabbed or pulled her into the clubhouse * * *.

{¶ 37} In response to appellant's multifaceted argument, we first note that there is no evidence in the record that A.W.'s behavior after the "rape" was either "unusual" or "unexpected" for the situation described by the victim. Thus, contrary to appellant's assertion, the state was under no obligation to present testimony from a "medical and/or mental health professional" to explain A.W.'s "behavior" after the incident.

{¶ 38} In regard to the remainder of appellant's arguments, we note that sexual assault cases are often "credibility contests" between the accused and the accuser. *See State v. Jackson*, 8th Dist. Cuyahoga No. 92531, 2010-Ohio-3080, ¶ 33. According to A.W., she did not consent to sexual intercourse with appellant. At trial, A.W. testified that once she realized what was happening she "lost her words." She explained that she was afraid that if she objected to taking off her bra, appellant would "use force." Appellant did not testify at trial, but during his interview with Detective Arp, appellant expressed remorse. While we recognize that appellant did not "confess" to any crime, the state argued that appellant's remorse was evidence of culpability.

{¶ 39} In her decision, the magistrate specifically held that A.W. was a "credible witness." The trial court judge, in an opinion overruling appellant's objections to the magistrate's decision de novo, specifically held that "[t]he victim was subject to cross

examination and never wavered with respect to the essential details of the rape incident. None of the alleged inconsistencies suggest that the finding of credibility made by the Magistrate is in error."

{¶ 40} The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Further, "a reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co.*, 10 Ohio St.3d at 80, 461 N.E.2d 1273.

{¶ 41} In regard to appellant's recorded interview with Detective Arp, the trial court found that "there was intercourse and [appellant] was regretful that it happened." The trial court further found:

> [Appellant] admitted that the victim was "iffy" on it, he shouldn't have done it, he would change it if he could go back in time, he made a "dumb, honest, mistake" in a "stupid, idiotic moment" and that he "provoked" her into doing it. [Appellant] told the officer that "I know what I did was wrong" and "I should have never done it."

{¶ 42} Where "evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict

and judgment, most favorable to sustaining the verdict and judgment." (Citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.*, 10 Ohio St.3d at 80, 461 N.E.2d 1273.

{¶ **43**} Given the testimony and evidence presented at trial, it was within the trial court's province, sitting as the trier of fact, to resolve conflicts in the evidence and issues of credibility in A.W.'s favor. This court will not second-guess the trial court in assessing the credibility of the witnesses. Nor will it second-guess the trial court's interpretation of appellant's statement that he "provoked" A.W. into having intercourse and the weight that statement had in finding the element of force proven beyond a reasonable doubt. Accordingly, appellant's second assignment of error is not well-taken.

## Third Assignment of Error

{¶ **44**} In his third assignment of error, appellant asserts:

> The trial court violated the Fourth, Fifth and Fourteenth
> Amendments of the U.S. Constitution and Article I, Sections 10, 14, and 16
> of the Ohio Constitution when it admitted into evidence the appellant's pre-
> trial oral statements made to the investigating detective as these statements

27.

were illegally obtained and solicited without the appellant being made aware of the constitutional rights or the Miranda warnings.

{¶ 45} Pursuant to Crim.R. 12(C)(3), "[m]otions to suppress evidence, including but not limited to statement and identification testimony, on the ground that it was illegally obtained[,]" must be raised before trial. Here, appellant first moved to suppress his pre-arrest statements during the adjudicatory hearing. Thus, he forfeited all but plain error. *See State v. Jones*, 9th Dist. Summit No. C.A. No. 26226, 2012-Ohio-2744, ¶ 14.

{¶ 46} The requirement that police administer Miranda warnings is triggered only when interrogations are custodial in nature. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 47. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 47} In determining whether an individual is in custody for the purposes of *Miranda*, the court considers "the circumstances surrounding the interrogation" and whether, under those circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). A non-custodial interrogation becomes custodial when there is a "formal arrest or restraint on freedom of movement" similar to that of a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). A determination of whether an interrogation is custodial or

28.

non-custodial depends on the objective circumstances of the interrogation, not the subjective views held by either the officer or the person being questioned. *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed. 2d 293 (1994).

{¶ 48} Here, appellant agreed to speak with Detective Arp, after the detective informed him he had taken a complaint from A.W. and wanted to get appellant's "side of the story." Detective Arp informed appellant that he was not there to arrest him and that he was under no obligation to speak with the detective. While appellant was only 16 years old at the time of the "interrogation" and had no prior experience with law enforcement, appellant indicated that he had nothing against law enforcement and was raised to tell the truth. Appellant's recorded responses suggest he is a mature, intelligent individual. When Detective Arp asked appellant if he could go inside appellant's home, appellant agreed. The conversation was of a short duration, lasting about 30 minutes. There is no evidence that appellant was coerced into speaking with the detective. There is nothing in the audio recording that would make us believe that appellant's statements were coerced, or that the detective played on appellant's fears or inexperience.

{¶ 49} Weighing all the circumstances surrounding appellant's interrogation, we find that appellant was not in custody or otherwise deprived of his freedom at the time of the "interrogation." Thus, appellant's statements were not subject to suppression under *Miranda*. We find no basis to conclude that the trial court committed plain error in refusing to suppress the same. Appellant's third assignment of error is not well-taken.

29.

**{¶ 50}** The judgment of the Sandusky County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                         _____
                                                                     JUDGE

Thomas J. Osowik, J.

                                                                     _____
James D. Jensen, J.                                         JUDGE
CONCUR.

                                                                     _____
                                                                     JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.